## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN
_____

**Jeremy Wicke**
**Shawn Simmons**
**Cole Knudson**

     **v.**                                        **Case No. 12-CV-638-wmc**

**L & C Insulation, Inc.,**                      **DEMAND FOR JURY TRIAL**
_____

### MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY
_____

## I.     INTRODUCTION.

The Plaintiffs filed a complaint against L & C, alleging that a number of L & C's payment practices violated the Fair Labor Standards Act, Wisconsin law, or both. Discovery shows that several L & C payment practices at issue are undisputed, so that the issues are ripe for resolution on summary judgment.

Specifically, L & C violated both the FLSA and Wisconsin law by failing to pay the plaintiffs for their attendance at classes for safety training and product installation and studying time. (PFOF ¶46) The plaintiffs' time attending unpaid training must be paid since attendance at the training was mandatory, and since the training was devoted to making the plaintiffs better insulators for L & C, and were therefore directly to their current employment.

Undisputed evidence further shows that the plaintiffs were required to attend Friday class and Nestle training, and that the class and training were directly related to the plaintiffs' current employment with L & C, so that under both the FLSA and

1

Wisconsin law all of the class and training time, must be paid and also be counted as hours worked for the purpose of calculating weekly overtime eligibility. (PFOF ¶29, 32-33, 40-41)  L & C therefore unlawfully failed to count the plaintiffs' hours attending the classes and training toward overtime eligibility.  (PFOF ¶25-28, 30)

Since L & C required the plaintiffs to complete take home tests and to pass closed book tests, and passing the tests required the plaintiffs to devote their off-duty time to studying, the time that the plaintiffs were required to complete take home tests and to study in order to pass the tests were compensable.  (PFOF ¶73-97)

Under the FLSA the plaintiffs were entitled to be paid for all of their time spent on overnight work trips, when the travel cut across their regular working hours. However their pay during these hours was reduced by two hours in each direction in violation of the FLSA. (PFOF ¶8)

By custom and practice the plaintiffs were also paid for their travel time outside regular working hours, and on trips in excess of two hours each way. (PFOF ¶12-13) By recognizing these trips as compensable trips, L & C by custom and practice assumed the obligation to count all of the hours spent on these trips as hours worked, for the purpose of determining the plaintiffs' eligibility for overtime pay. Under parallel Wisconsin law the plaintiffs were entitled to be paid for all of their travel time on trips where they were eligible for company paid motel stay away from home.

L & C additionally violated Wisconsin law, which requires overtime pay to be calculated based on the weighted average of the wages received by the employee

during the workweek, by calculating overtime pay using the often lower rate for the specific work that the employee performed during overtime hours.  (PFOF ¶43-45)

Finally, L & C violated Wisconsin prevailing wage laws by improperly taking credit for apprenticeship, personal pay, and holiday pay contributions, and by taking an excessive high credit for health insurance contributions that it made for Plaintiff Knudson. (PFOF ¶100-118)  The Plaintiffs are owed additional prevailing wages since all amounts of improper benefit credit must be made up penny for penny by additional wages which must be paid to the plaintiffs.  The Court should therefore grant the plaintiffs' partial summary judgment, and find that L & C has violated the FLSA and Wisconsin law in the manner urged by the motion.

Plaintiffs are not seeking summary judgment on damages. Plaintiffs timely served their report on damages, along with supporting tables and calculations to L & C on November 4, 2013.  L & C has not designated an expert witness in response to receiving the report. (PFOF ¶122-123)   The Plaintiffs believe that the Court's decision on the liability issues listed above will facilitate the parties' settling the calculation of damages owed to the plaintiffs.

### III.    ARGUMENT.

A.    <u>The Standard for Summary Judgment</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986), *Baldewein Co. v. Tri-Clover, Inc.*, 183 F. Supp. 2d 1116 (E.D. Wis. 2002).

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252(1986).  While any inferences drawn from the facts must be viewed in the light most favorable to the non-moving party, only reasonable inferences can be made. *Felce v. Fiedler,* 974 F.2d 1484, 1488 (7th Cir. 1992).  In order to defeat summary judgment, the plaintiff's inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors. *Visser v. Packer Engineering Assoc.* 924 F.2d 655, 659 (7th Cir. 1991).

In the case at bar, undisputed facts show that the subject payroll practices of L & C violated both the Fair Labor Standards Act and Wisconsin law.   The plaintiffs therefore are entitled to summary judgment in their favor.

B.      L & C is Required to Pay the Plaintiffs for Unpaid Training.

L & C failed to pay the plaintiffs for attending four types of unpaid training:   A Fundamentals of Crew Leadership Class, firestop class, OSHA training, and First Aid/CPR Training. (Proposed Findings of Fact ("hereinafter "PFOF", ¶46) Under the FLSA, time spent attending training can be excluded from hours worked only if the training meets all four requirements of 29 C.F.R. §785.27, i.e. that the training is outside regular work hours, is voluntary, is not directly related to the employees' job, and the employee did not perform any productive work while attending training.  The identical

4

four requirements are required by Wisconsin law.  See DWD §272.12(2)(f)(1).  Training is considered mandatory when the employer informs the employee, whether through supervisors or corporate email, that they must attend the training.  *Freeman*, 2013 U.S. Dist. Lexis 112871 *19-20.  *See also Kosakow v. Rochelle Radiology Assoc.*, 274 F. 3d 706, 714-715 (2nd Cir. 2001) (Training would not be voluntary if employer required employee to maintain a certification, which in turn required training attendance). The Western District of Wisconsin follows the four prong test in determining whether training must count as hours worked under the FLSA.  *Freeman v. Total Sec. Mgmt.*, 2013 U.S. Dist. Lexis 112871 *15 (W.D. WI. 2013).   All of the training are compensable under both the FLSA and Wisconsin law because they are both mandatory, and are directly related to the employees' existing jobs as insulators.

The four listed types of unpaid training were mandatory.  Employees received notice that they were scheduled to attend training either through direct notice from an L & C supervisor, or through a note that they received along with their paychecks.  (PFOF ¶47)  The notices simply informed the employee on when and where he is expected to attend the unpaid training.  (PFOF ¶48)  The notices were sent to employees even though they had not expressed any interest in attending the class. (PFOF ¶51) Nor  did L & C inform employees that they had the option of not attending unpaid training. (PFOF ¶52)  If an employee missed unpaid training L & C President Gauchal called the employee, and ask him why he did not attend.  (PFOF ¶53)  L & C's handbook required employees to attend special meetings; while it never explained to employees that unpaid training classes did not constitute special meetings. (PFOF ¶34, 50) The

5

plaintiffs therefore reasonably understood the training classes to be special meetings that they were required by L & C's handbook to attend. (PFOF ¶50) Since whether the employees were required to attend training must be evaluated from the employees' perspective, see 29 C.F.R. §785.28, DWD §272.12(f)(2), the Court should find that the plaintiffs were required to attend the unpaid training classes.

Under 29 C.F.R. §785.28, training is also mandatory if the employee is given to understand or led to believe that his present working conditions would be adversely affected by non-attendance.   Undisputed facts show that L & C did not ask its employees' permission before signing them up for unpaid training, and that each of the training courses had an enrollment fee that the employee was required to reimburse L & C, should he fail to attend the scheduled training.  (PFOF ¶51, 54) On the other hand, employees were not required to repay L & C if they did attend the training.  (PFOF ¶55) Reimbursing L & C would effectively reduce the employee's take home pay from L & C, and adversely affect his present working conditions.  Each of the plaintiffs indeed stated in their declarations that they would view the reimbursement requirement, which could be in the hundreds of dollars, as one that compelled their attendance at the unpaid training. (PFOF ¶56, 57)

Nor is there any dispute that L & C listed training class as an area to work on for each and every one of plaintiffs' annual reviews. (PFOF ¶58)  The areas to work on in the reviews constituted a blueprint for the employee to work on so that he could  receive the next raise.  (PFOF ¶60)  One review indeed specifically informed an employee that he had to make a better effort to attend class, as a part of the blueprint for him to

6

receive a wage increase for the following year.  (PFOF ¶61)  Gauchal has never informed his employees that the reference to attending training classes in their annual reviews do not refer to their attendance at unpaid training. (PFOF ¶63)  Based upon the reviews the plaintiffs could, and did reasonably understand that their eligibility to receive wage increases could be affected by their non-attendance at unpaid training. (Id.) Whether an employee is required to attend training must be evaluated from the employee's reasonable understanding.  29 C.F.R. §785.28; DWD §272.12(2)(g)(2).

The annual reviews produced by L & C show that its employees would receive a wage increase at each annual review.  (PFOF ¶64-65) Therefore, L & C employees' present conditions of employment included receiving a wage increase each year, assuming they performed consistently with L & C's expectations.  The plaintiffs' present employment conditions, specifically wages, therefore would be adversely affected by their non-attendance at unpaid training, as they would then lose an otherwise scheduled wage increase.  The plaintiffs' attendance at unpaid training was therefore mandatory. Additionally, Gauchal admitted that he has never informed employees that attending unpaid training was a precondition of their hire, so that L & C cannot successfully argue that training attendance was voluntary, because it was a pre-hiring prerequisite that the plaintiffs could fulfill subsequent to their hiring. (PFOF ¶22)

Nor is there any material dispute that the training is directly related to the plaintiffs' existing jobs as insulators.  The Fundamentals of Crew Leadership Class taught subjects such as how to organize materials better, how to accomplish work tasks more efficiently, and how to communicate more effectively with other members of the

7

crew.  The Leadership Class was designed to help the employees work more effectively as insulators for L & C. (PFOF ¶66) The OSHA training is designed to help L & C employees work safer, which allows them to be better insulators for L & C in that they would be available for work more often, and L & C saves money on its workers' compensation premiums because its employees are working more safely.  (PFOF ¶68) For those reasons L & C frequently informed its employees of the importance of working safely, and viewed its employees attending OSHA training as a part of its safety policy. (PFOF ¶69, 70)  Likewise, the First Aid/CPR class teaches employees how to properly treat workplace injuries, which results in the employees missing fewer days while working for L & C.  (PFOF ¶71)  Finally, the firestop class taught employees how to install fire stop materials, the exact same materials that the plaintiffs would install in their day to day work for L & C. (PFOF ¶72) In each instance, the unpaid training was designed to teach the plaintiffs to be better and more valuable insulators for L & C, whether in improving their ability to work in a more organized and effective manner, increasing the range of materials that they could install, improving their safety record and work availability, or their ability to properly treat other employees for their work injuries.  The training therefore was directly related to the plaintiffs' existing employment as L & C insulators, it was work under both the FLSA and Wisconsin law and therefore had to be compensated.

Under the FLSA, all hours worked must be counted for the purpose of determining the employees' eligibility for weekly overtime pay.  29 U.S.C. §207(a)(1).

Under Wisconsin law the class time must both be paid, and must be counted in determining overtime pay eligibility.  See *German v. Wisconsin DOT*, 2000 WI 62 ¶29, 235 Wis. 2d 576 (2000); Wis. Stat. §109.03(5) (Under Wisconsin law each employer must pay to each of its employees, for each payroll period, all wages required by law). Therefore, while the FLSA is a minimum wage statute, under Wisconsin law L & C must pay a separate hourly wage to the plaintiffs for all of their compensable hours worked. See also *Jacobson v. American Tool Cos.*, 222 Wis. 2d 384 (Ct. App. 1998) (Employer violated §109.03 by failing to pay to former chief executive his full stock appreciation rights, as required by his employment contract).   The employer's obligation to pay wages required by Wisconsin law is enforceable through §109.03(5).  *German, supra*.

C.   <u>L & C violated both the FLSA and Wisconsin Law by Failing to Treat the Plaintiffs' Class and Nestle Training Time   as Hours Worked, For the Purpose of Calculating Their Eligibility for Weekly Overtime Pay.</u>

1.   <u>Time Spent by the Plaintiffs Attending Friday Class and Nestle Training are Hours Worked Under Both the FLSA and Wisconsin Law.</u>

L & C concedes that hours spent by the plaintiffs on Nestle training should be counted towards weekly overtime eligibility.  (PFOF ¶31)  Undisputed facts also demonstrate that the Friday training classes must count as hours worked both because they were mandatory, and because they were directly related to the employees' job. However the undisputed facts show the Nestle and Friday training time was not included in calculating overtime.  (PFOF ¶25-28, 30)

As set forth above, training is considered mandatory when the employer informs the employee, whether through supervisors or corporate email, that they must attend

9

the training.  *Freeman*, 2013 U.S. Dist. Lexis 112871 *19-20.   *See also Kosakow v. Rochelle Radiology Assoc.*, 274 F. 3d 706, 714-715 (2nd Cir. 2001)

In his deposition Gauchal admitted that there was a practice of requiring employees to attend the Friday training classes, that the employees were expected to show up at the classes, and that if the employees did not show up for the classes, they would receive a telephone call from Gauchal asking them why they did not show up for the classes. (PFOF ¶32, 33)  Whether an employee is required to attend training must be evaluated from the employee's reasonable understanding.  29 C.F.R. §785.28; DWD §272.12(2)(f)(2).   L & C's handbook, which are handed to employees when they are first hired, specifically provided that: "all employees are expected to attend scheduled company or department meetings.  Special meetings are to be attended by those who are notified." (PFOF ¶34) L & C has never explained to its employees that training classes are not special meetings. (PFOF ¶35)   In fact, each of the plaintiffs reasonably believed that training classes constituted special meetings that they were required to attend. (PFOF ¶36)

Nor can L & C successfully claim that the plaintiffs' attendance at Friday training was voluntary, because such training was a pre-hiring requirement that they could fulfill subsequent to their hiring.  Gauchal has never informed anyone that completing the Friday training was a prerequisite for working for L & C.  (PFOF ¶37)

Moreover, none of the plaintiffs ever became bona fide apprentices while working for L & C.  (PFOF ¶39)  Under DWD §272.12(2)(f)(5), only training time for employees who are employed pursuant to a written apprenticeship agreement or program can be

10

exempted from compensation.  The regulation therefore cannot apply to excuse L & C from paying the plaintiffs, who were never apprentices recognized by the State of Wisconsin.

Undisputed evidence further establishes that the subject of Friday training was directly related to the plaintiffs' work as insulators for L & C.  Training is directly related to the employee's job if it is designed to make the employee handle his current job more effectively, as distinguished from training him for another job, or to a new or additional skill.  29 C.F.R. §785.29, DWD §272.12(2)(g)(3).  The Friday classes are designed to teach employees the properties of the different materials used in their work, and how to install and apply the different types of insulation, so that they can become journeyman insulators.  (PFOF ¶40) Since the plaintiffs' work for L & C requires them to install different types of insulation, the Friday class training is directly related to making the plaintiffs better insulators, and therefore directly related to their work for L & C.  (Id.).

Finally, the training classes are work time because during those classes the plaintiffs were required to perform productive work, specifically loading and unloading trucks at the La Crosse Warehouse. (PFOF ¶41)

2.   The Friday and Nestle  Class Time Must Count as Hours Worked for Overtime.

Since the Friday and Nestle training classes were both involuntary, and directly related to the plaintiffs' current jobs as insulators, under both the FLSA and Wisconsin law the training must be counted as hours worked.  L & C, however, maintained a policy of never paying the plaintiffs overtime for their time spent attending Friday meetings and classes. (PFOF ¶25-28)  L & C also holds Nestle training at its facility, on the same day

11

as the Friday meetings and classes, which the employees need to complete in order to work at a Nestle plant for L & C. (PFOF ¶29) L & C has admitted in depositions that it did not count its employees' time spent attending Nestle training as hours worked in determining their eligibility for weekly overtime pay.  (PFOF ¶30)  L & C further admits, that the time spent attending Nestle training should be counted in calculating the employees' entitlement to weekly overtime pay, but has not in fact included the Nestle tranining in calculating overtime.  (PFOF ¶31)

Pursuant to 29 U.S.C. §207(a)(1), if the employee's work week is longer than 40 hours, he must receive compensation for his hours worked in excess of 40 for the week, at a rate not less than one and a half times the regular rate at which he is employed. Since the plaintiffs' time spent attending Friday classes and Nestle training must be counted as hours worked, they must both be included within the 40 hours for the purpose of calculating the employee's eligibility for weekly overtime pay, and paid at 1.5 times the regular rate if the class time in fact occurred after the employees had already worked 40 hours for the week.

Gauchal's claim that he was told by someone from the ABC Apprenticeship Committee that class time need not be included in calculating weekly overtime eligibility is not a valid defense.  Under 29 U.S.C. §259, only a written administrative regulation, order, ruling, approval, or interpretation by the Administrator of the DOL's Wage and Hour Division can excuse an otherwise violation of the FLSA.

DWD §274.03 similarly provides that employers must pay employees at time and a half the regular rate of pay for all hours worked in excess of 40 for the week.  Since

the plaintiffs' time spent attending Friday classes and Nestle training are hours worked within the meaning of Wisconsin law, they must be counted as hours worked for the purpose of determining the plaintiffs' eligibility for weekly overtime pay.

      D.    <u>The Plaintiffs Must be Paid for Their Studying Time.</u>

Under the FLSA, off-duty activities performed by the employee are compensable if it is either required by the employer, and the time spent performing the activities cannot be effective used by the employee to engage in other desired endeavors, or if the employee's terms and conditions of employment could be adversely affected for failing to perform the off-duty activities.  *Mory v. City of Chula Vista*, 2010 U.S. Dist. Lexis 100777 *24-29 (S.D. CA. 2010); *Maynor v. Dow Chemical Co.*, 671 F. Supp. 2d 902, 922 (S.D. TX. 2009) (40 hours of studying time per year compensable because in the event the employee failed the assessment, he could be disciplined for failing to spend adequate time studying for the assessment).

Time spent by the employees to complete take home tests therefore must be compensated.  There is no dispute that employees are sometimes required to complete take-home tests, and that there would not be time during the class or the employees' work day for the employees to complete the tests.  (PFOF ¶74, 77) Since the plaintiffs' eligibility for scheduled wage increases, an existing condition of their employment, was conditioned upon them passing all tests including take home tests, L & C required the plaintiffs to spend their off-duty time completing the take home tests. (PFOF ¶76) Moreover, during the time spent completing the take home tests the plaintiffs were required to devote all of their attention and concentration to the tests, so that they could

not use the time spent completing the tests simultaneously to engage in other personal pursuits. (PFOF ¶78-79) Time spent by the plaintiffs completing the take home tests therefore was compensable under the FLSA.

There is no dispute that during Friday training L & C taught employees chapters from training manuals, and that a test was given at the end of each chapter, and that the employee was required to obtain a passing trade of 70% on each test.  (PFOF ¶73-75) The employees' eligibility for a wage increase was conditioned on his passing all of the current tests.  (PFOF ¶75)  Since the plaintiff's existing conditions of employment included the expectation that they would receive wage increases should they comply with L & C's expectations concerning their work performance, the employees' existing conditions of employment were adversely affected by the threat L & C would deny the plaintiffs a wage increase if they were not current on passing all of the tests.

Compensation under the FLSA includes all time that the employee must spend for the employer's benefit, as a direct result of the employer's requirements, even if the time spent is not directly required by the employer.  *Kosakow*, 274 F. 3d at 721-722 (Must compensate plaintiff for time spent training, which was required by the certification that the employer required the employee to maintain).  Similarly, if the plaintiffs are required to study using their off-duty time in order to pass the tests, L & C has effectively required the plaintiffs to use their off-duty time to study, so that the studying time is compensable under the FLSA.

For the purpose of summary judgment the material facts on the in-class tests are stated in manner most favorable to L&C [1]:  According to L&C, in class tests were given either immediately after Gauchal finished teaching a chapter, or during the next class, after the one in which the lecture on the chapter was given.  (PFOF ¶80)  If the test was given during the next class, a 10-15 minute refresher lecture would be given on the chapter before the test. (PFOF ¶81)  In instances where the test was given during the same class as the lecture, at the end of the preceding class the students would be told what chapter would be covered by the following class.  (PFOF ¶82)  The classes were spaced one month apart. (PFOF ¶83)  The original and refresher lectures covered most, but not all questions on the test.  (PFOF ¶84)  Gauchal acknowledges he may cover the answers to different test questions each time he teaches a chapter, and only his mentally keeping track of what he covered ensured that usually enough test questions would be covered by the lecture to permit the students to pass the tests.  (PFOF ¶85)  The tests were closed book, and therefore required students to memorize the materials that they would be tested upon, including materials that they did not need to use in their day to day work for L & C.  (PFOF ¶86-87)  Gauchal, who set up this testing system, believes that his employees are in construction because they are not good students, and did not do well in high school.  (PFOF ¶88)

---

[1] Plaintiffs do dispute L & C's claims that tests are given immediately after the lecture on a chapter, that there would be a refresher lecture before a test is given during the next class after the one in which the lecture on the chapter was given, as well as the number of test questions that would be covered by the review.   However, these factual disputes are not material because studying during off-duty time would be inevitable even when all factual disputes are construed in L & C's favor.

As shown by the materials presented by the plaintiffs, each chapter may include 25-40 pages of single spaced material, which could include numerous formulas, steps for performing calculations, and other materials that seem foreign to persons who are not journeymen insulators. (PFOF ¶89)  The tests contain questions that were either directly from the text of the chapter, or were new examples designed to test the employee's comprehension of the material.  (PFOF ¶90)  In order to pass the test, the employee must memorize enough of the information and formulas in the chapter, so that he can answer the questions on the closed book tests.  One of the chapters, Trade Math, contains ten different formulas for calculating different surface areas for shapes, along with a long list of definitions and other dense material. (PFOF ¶96)  At least 6 out of the 15 test questions required the students to apply the formulas to solve problems that do not appear in the textbook. (PFOF ¶97)

Given that the tests were closed book, and that the plaintiffs needed to answer at least 70% of the questions correctly to pass the tests, L & C required the plaintiffs to memorize enough of the information and formulas contained in the 25-40 single spaced chapters, so that they could answer enough test questions correctly to pass the tests. None of the plaintiffs were able to retain all of the information addressed by Gauchal in his original and refresher lectures, so that they could answer test questions correctly solely based upon their recollection of what Gauchal taught.  (PFOF ¶91, 94)  The plaintiffs were not able to understand everything said by Gauchal in his lectures to answer questions correctly, much of which would concern materials that seem foreign to persons who are not journeymen insulators, and therefore sometimes needed to review

16

the chapters on their own to understand the materials. (PFOF ¶89, 92) The plaintiffs'
need to use their own time to review the chapters, and understand and memorize its
materials was made even more acute by the fact that Gauchal did not cover all of the
test questions in his lectures, which reduced their margin of error for misunderstanding
or forgetting what Gauchal said, by the time of taking the tests.  The Court should
therefore find, as a practical matter, that L & C's requirement that the plaintiffs pass
closed book tests required them to study during their off-duty time, so that the studying
time was compensable under the FLSA.

The Plaintiffs' studying time is also compensable under Wisconsin law.  While
DWD regulations do not directly address study time, §272.12(2)(f) does apply to
activities similar to attendance at training programs, and therefore should also apply to
studying.   In the same way that training attendance required by the employer is
compensable under §272.12(2)(g), off-duty studying time required by the employer also
should be compensable under the regulation.  More generally, work time is defined by
Wisconsin law as including all time spent engaging in physical or mental exertion
primarily for the employer's benefit.  See DWD §272.12(1)(a)1.

Interpreting the identical language in the FLSA, courts have held that any
exertion required by the employer is necessarily primarily for the employer's benefit.
*Hoyt v. Ellsworth Coop. Creamery*, 579 F. Supp. 2d 1132, 1138 (W.D. WI. 2008).  *See
also Sehie v. City of Aurora*, 432 F. 3d 749, 752 (7th Cir. 2005) (Fact medical treatment
enabled the employee to perform his job more effectively and at a higher skill level

17

shows the treatment was primarily for the employer's benefit, even though the employee also benefited from the treatment).

Studying for the tests taught the students the knowledge that they needed to become journeymen insulators, and therefore was directly related to the work that the plaintiffs performed for L & C.  (PFOF ¶98)  There is no reasonable argument that L & C required the plaintiffs to pass the tests to benefit their future employers, as opposed to making them better employees for L & C, their current employer.  Moreover, the fact that the plaintiffs were threatened with the loss of their expected wage increases, i.e. an adverse change to their present working conditions if they did not answer at least 70% of the questions on the tests correctly, and that passing the tests was not possible without using off-duty time to study, shows that the studying was required by L & C, and that therefore it was primarily for L & C's benefit.  Similarly, L & C required the plaintiffs to use their off-duty time to complete take-home tests, so that the time they spent completing take home tests was also primarily for L & C's benefit.  All of the plaintiffs' studying time therefore was compensable under Wisconsin law.

E.    L&C Failed to Pay Travel Pay Required under the FLSA

1.  L&C Failed to pay travel pay for overnight assignments which cut across work hours.

The law for travel time compensation under the Fair Labor Standards Act is well settled.  Under 29 C.F.R. §785.39, "travel that keeps an employee away from home overnight is travel away from home. Travel away from home is clearly work time when it cuts across the employee's workday."  An employer therefore may not adopt a rule excluding some of the employees' travel time from counting as hours worked,

regardless of those hours of travel time occurred what would have been the employee's normal workday.

The plaintiffs regularly worked at jobsites far enough from their homes so that they stayed at a motel near the jobsite, rather than return home, during evenings between the days when they worked at the jobsite.  (PFOF ¶7) Federal courts that have considered §785.39 have consistently applied it to the letter.  *Dekker v. Constr. Specialties of Zeeland*, 2012 U.S. Dist. Lexis 29336 * 9-10 (The FLSA requires the employer to pay for overnight, out of town travel when it cuts across the employees' work day); *Treadway v. BGS Constr. Inc.*, 2007 U.S. Dist. Lexis 71149 (S.D. WV. 2007) (Even though employees were regularly required to travel outside West Virginia for work, strictly followed §785.39 to hold that employees entitled to be paid when they had an overnight stay for work away from their home in West Virginia).  *See also Mendez v. Radaz Corp.*, 232 F.R.D. 78, 86-87 (W.D. NY. 2005) (Employees entitled to be paid when they traveled for work to a location, where they are expected to have overnight stays away from home).

When the plaintiffs left their homes of Wausau and Eau Claire, and traveled to other locations where they received company paid motel stays, pursuant to §785.39 they are entitled to be paid for all of their travel time, which cut across their regular working hours. L&C had a standard policy of not paying for the first two hours of travel when the trip was overnight, even when the traveling occurred during regular working hours. (PFOF ¶8)

L & C has failed to maintain any records of when the employees began and finished working on its jobsites, though those records are required to be maintained by Wisconsin law.  DWD §272.11.   (PFOF ¶17)  Knowing when the plaintiffs started working would permit reconstruction of when the plaintiffs were driving, which had to be before or after the time that the plaintiffs spent working on the jobsites.  Hours worked can be inferred as a matter of just and fair inference, when the employer failed to maintain accurate and legally required records of the employees' hours worked. *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680 (1946).  The plaintiffs' regularly worked between 6 a.m. and 5:30 or 6 p.m., so that their regular working hours are 11-12 hours per day.  (PFOF ¶16)  Therefore, when L & C deducts the first two hours of travel time, even when the employee (including travel time) only worked less than 11-12 hours per day, the Court can find as a matter of just and fair inference that the travel time occurred within regular working hours. For example on one weeks time record Shawn Simmons worked ten hour days on Monday through Wednesday, but on Thursday worked six hours before traveling for four hours, thus implying as a matter of just and reasonable inference that all four hours of travel time occurred during regular working hours. Nonetheless, Simmons was not paid for two of the four travel hours.  (PFOF ¶18)

L&C must comply with the FLSA in the manner in which it carries out its policy of paying for travel time.  §785.39, like other travel pay requirements under the FLSA, are subject to the requirement of 29 U.S.C. §254(b)(1).  That provision states that home to work travel made non-compensable by the Portal to Portal Act nonetheless is compensable, to the extent that the employer's custom or practice makes the trip a

compensable one. In *Wirtz v. Sherman Enterprises*, 229 F. Supp. 746, 753 (D. MD. 1961) the court held that when the employer paid the employee wages for traveling in a company furnished station wagon, each hour spent by the employee in the station wagon must be paid in compliance with the FLSA minimum wage provisions, even assuming the traveling time ordinarily would not be compensable under the law). In other words, once the employer by custom or practice treated travel as compensable, the trip must be treated as compensable, and paid in the manner prescribed by the FLSA.

In the case at bar, L & C adopted the policy of paying employees for their travel time in excess of two hours each way, when employees worked more than two hours away from their homes, and regardless of when during the day or night the traveling occurred   (PFOF ¶10-11)   L & C's custom therefore establishes that trips are compensable when (1) it is more than two hours each way, regardless of whether there is an overnight stay; or (2) when the employee had an overnight stay, regardless of when during the day or night the traveling occurred.  Since the trips are compensable, all hours spent on the trips must be treated as hours worked.  L & C failed to do so by excluding from overtime computation the first two hours each way traveled on compensable trips.

F.   <u>L & C Violated Wisconsin Law by Failing to Compensate the Plaintiffs for All of Their Travel Time Away from Their Home Communities</u>.

L & C's policy of not paying the plaintiffs for their first two hours of travel time violated Wisconsin law.   Under Wisconsin law, whether travel time must be compensated is governed by DWD §272.12(g).  While ordinary home to work travel is

not compensable pursuant to DWD §272.12(g)(1), the regulation then sets out a number of exceptions, under which travel time must be recognized by the employer as hours worked and paid.  Specifically, DWD §272.12(g)(6) provides:

> Travel time away from the home community for business purposes that occurs for the benefit of the employer is considered hours worked.

There is another provision under §272.12(g) that addresses special one day assignments, which provides that for employees who regularly work at a fixed location and have an unusual assignment that requires traveling, all travel time aside from his normal home to work commute is compensable.  See §272.12 (2)(g)(4). That regulation does not apply to the case at bar since the plaintiffs do not work at a fixed assignment, and regularly travel to work, so that the travelling cannot be for an unusual assignment. (PFOF ¶7)

While for "particular and unusual assignments" special one day assignments the employer may exclude from compensation the portion of the trip that constitutes normal home to work travel, no parallel exclusion is permitted by §272.12(g)(6). The plaintiffs were regularly assigned away from their home communities. (PFOF ¶7)  Therefore, §272.12 (2)(g)(4) does not apply and DWD §272.12(g)(6) requirement that "travel time away from the home community for business purposes that occurs for the benefit of the employer is considered hours worked. " does apply.  To the extent plaintiffs work trips constitute travel away from their home communities under §272.12(g)(6), all hours spent by the plaintiffs on such trips must be counted as hours worked, and paid.

There is little basis for L & C to dispute that the employee's trips to jobsites so that they can install insulation for its customers are business trips; and that both the

initial trip from home to the jobsite, and the final trip from the jobsite back home are for the employer's benefit. *Berry v. Excel Group Inc.*, 288 F. 3d 252, 254 (11th Cir. 2002) (When employer knows where the employer resides, hires him, then sends him to a jobsite 100 miles from his home, the employee's travel to the jobsite was primarily for the employer's benefit). *See by analogy Tenn. Coal v. Muscoda*, 321 U.S. 590 (1944)(Employees' travel between the surface and the mine is primarily for the employer's benefit). The employee's travel between the jobsite and home during the middle of the week, when they had the option of staying at the jobsite, is also primarily for L & C's benefit: They would not be in a position where they are required to travel the long distance home, except for the fact that they are performing work for L & C at a jobsite distant from their home. Such travel additionally benefits L & C since it would not have to pay the employee's hotel and per diem costs for the stay away from home, on nights when they assume the additional burden of making the long drive home. (PFOF ¶19)

While no case law has defined what constitutes a home community within the meaning of §272.12(g)(6), the practice at L & C shows that the home community should be defined as the area within 90 miles, or an hour and a half travel time from the employee's home. As the court held in *Treadway*, paying the employees a per diem, which is not done when the employees are working close to home, is recognition that the employees are working away from their home communities. Similarly, under L & C policy 90 miles is the dividing line for whether an employee is eligible for a company paid hotel stay away from home. (PFOF ¶13) If an employee is eligible for and elects to

stay away from home overnight, he is also eligible for a company paid per diem meal reimbursement.  (Id.) The different treatment once the employee's jobsite is at least 90 miles away from the employee's home demonstrates that at L & C, the home community is defined as the area within 90 miles travel distance of the employee's home.

L & C violated DWD §272.12(g)(6) by failing to count as hours worked the first two hours of travel time each way, when the plaintiff's trip is for business purposes and L & C's benefit.  The plaintiffs are therefore entitled to a judgment holding, as a matter of law, that all of their travel time on trips where they are eligible for a company paid motel stay must be paid pursuant to DWD §272.12(g)(6).  Under Wisconsin law all of the plaintiffs' compensable travel time must both be treated as hours worked for overtime purposes, and paid.

> G.    Under Wisconsin Law, the Plaintiffs' Overtime Pay Must be Calculated Using the Average Wage Rate They Earned During the Workweek.

Under L & C policy, overtime pay is calculated using the rate for the specific work that the employee performed during overtime hours. (PFOF ¶43) For example, an employee's overtime drive time would be paid at 1.5 times the minimum wage even though the employee performed work other than driving during the week, so that his average wage rate per hour for the week was much higher than the minimum wage. (PFOF ¶44) L & C thereby violated Wisconsin law, which requires it to pay to the plaintiffs overtime pay calculated using the average wage rate that they earned during the workweek.

24

Under Wisconsin law, the employees must receive for their overtime hours worked 1.5 times their regular rate, a term that is not defined by Wisconsin statutes, and only defined by Wisconsin regulations with respect to tipped employees. DWD §272.03(h) provides that for tipped employees, the regular rate is calculated by dividing the employee's total remuneration for the week, including hourly pay, tipped credit, tips, and bonuses, by the total number of hours worked for the week. The DWD has also found, in an interpretation approved by the Wisconsin Court of Appeals, that the regular rate for salaried employees should be calculated by dividing the weekly salary by the total number of hours worked by the employee for the week. *Kuhnert v. Advanced Laser Machining Inc.*, 2011 WI App 23 p. 14, 331 Wis. 2d 625 (Ct. App. 2011). The DWD's online publication, Wisconsin Hours of Work and Overtime Pay (ERD Publication ERD-8298-C) suggests that the same calculation method for determining the regular rate also applies to non-salaried employees who are paid in more than one way. It defines the regular rate as:

> The employee's rate of pay per hour. An employer may choose to pay employees on a salary, commission, piece rate or other basis, but for purposes of calculating overtime pay for an employee, the employee's wages must be converted into an hourly rate of pay. This can be accomplished by dividing the total hours an employee actually works in a pay period into the total regular wages the employee is paid in that pay period (regular wages would include hourly wages, commission, piece rate pay, bonuses, etc.)

PFOF ¶45. The DWD's interpretation, which is entitled to great weight deference from the Court, see *Kuhnert*, 2011 WI App 23  p. 13, therefore suggests that the regular rate of pay for all employees other than salaried and tipped employees should also be calculated based off their average hourly wage for the workweek.

25

The same conclusion is supported by considering the equivalent provisions of the FLSA.  29 U.S.C. §207(a) defines the employees' overtime pay based on his regular rate.  29 C.F.R. §778.115 creates the default rule that the regular rate should be the weighted average wage earned by the employee during the workweek.  However, 29 U.S.C. §207(g)(2) provides that when there is an agreement between the employer and the employee, the regular rate may be 1.5 times the hourly or piece rate earned by the employee during non-overtime hours.  The FLSA therefore provides that as a default rule, overtime pay must be calculated using the weighted average wage rate earned by the employee during the workweek.  Since Wisconsin law does not contain an exemption parallel to §207(g)(2), the default rule of paying overtime using the weighted average wage rate applies under Wisconsin law without exception. *See Weissman v. Tyson Prepared Foods*, 2013 WI App 109 p. 47, 350 Wis. 2d 380 (Ct. App. 2013) (Court should give significance to the fact that a FLSA regulation has not been adopted by Wisconsin law).  Moreover, 29 CFR §207(g)(2) appears directly contradictory to the DWD's interpretation of Wisconsin law. While §207(g)(2) authorizes paying a piece worker overtime pay using the piece rate for the work performed during overtime hours, under Wisconsin law the piece worker must be paid at his weighted average wage rate for the workweek.  (PFOF ¶45)

The Court should therefore rule as a matter of law that under Wisconsin law, the plaintiffs' regular rate must be calculated using the weighted average wage rate that they earned during the workweek.

> 6.    L & C Improperly Claimed Fringe Benefit Deductions When Its Employees Worked on Prevailing Wage Projects.

Under Wisconsin law, there is a prevailing wage determination that applies to each prevailing wage project.  Wis. Stat. §66.0903(3)(am).  For each hour worked by each covered employee on the prevailing wage project, the employee must receive a combination of wages and bona fide fringe benefit contributions that equal the total prevailing wage rate set in the prevailing wage determination.  DWD §290.04(1).  An employer therefore owes wages to its employees for prevailing wage projects, if it claims credit for fringe benefits that are not bona fide. L & C claimed, in relevant part, personal pay, holiday pay, apprenticeship, and health insurance contributions for prevailing wage projects worked by the plaintiffs. (PFOF ¶99, 101)

DWD §290.01(10) divides fringe benefits into funded and unfunded programs, and sets different requirements for each, before the contributions can be recognized as bona fide.  Unfunded programs, defined as those where the employer does not make contributions to a third party, are considered bona fide, in relevant part, only if (1) the employer makes a written commitment to carry out a financially responsible plan or program; (2) a copy of the unfunded program has been provided to the DWD.  DWD §290.01(10)(c).  L& C's "program" of providing personal time and holiday pay to its employees does not meet either requirement.

First, an unfunded program can be considered bona fide only if the employer makes an enforceable written commitment to provide the benefit to its employees. There are two documents produced by L & C that describe the personal and holiday pay benefits:  The employee handbook and the employees' annual wage reviews. (PFOF

27

¶102)  When the employee receives the employee handbook, they sign a disclaimer stating:

> I acknowledge that this handbook and its contents, though it governs my conduct while an employee of L & C Insulation, in no way, shape, or form creates any contract of employment.

(PFOF ¶103)  L & C through Gauchal admits that the handbook, as a result of the disclaimer, does not constitute a written guarantee of benefits for L & C employees. (PFOF ¶104)  Indeed, at all times when the plaintiffs were employed at L & C the handbook contained a provision stating that the employees would forfeit their earned but not taken personal time if they quit from L & C without giving two week written notice of resignation, thus further highlighting that the personal and holiday benefits are not guaranteed by contract.  (PFOF ¶105)

Each of the annual reviews received by the plaintiffs contained a similar disclaimer stating: "This is not a contract, just a wage description."  (PFOF ¶106)  L & C through Gauchal candidly acknowledges that it has the right to modify the fringe benefits at anytime, and there is no contract at L & C that guarantees personal time pay to its employees. (PFOF ¶107)  The admissions equally apply to holiday pay benefits, since the same L & C documents describe the personal and holiday pay benefits in similar terms. (PFOF ¶103, 106) Whether L & C in fact ever intends to change the personal and holiday pay benefits is immaterial when the administrative regulation requires a written commitment to provide an unfunded benefit before the benefit can be considered a bona fide one for the purpose of counting the costs of the benefit towards complying with prevailing wage requirements, and neither the handbook nor the annual

review constitutes a written commitment that the employees would receive the personal and holiday pay promised.

Moreover, while DWD §290.01(10)(c)2a provides that unfunded plans are bona fide only if a copy of the plan is provided to the DWD, and the requirement is reinforced by the language in DWD §290.04 that an employer must supply a copy of the unfunded plan to the DWD before it can be given prevailing wage credit for an unfunded plan or program, there is no dispute that L & C has never provided to the DWD any documentation describing the personal or holiday leave benefits that it provides to its employees.  (PFOF ¶108)  L & C cannot claim prevailing wage credit for its personal and holiday pay to the plaintiffs for this additional reason.

With respect to funded benefits, which are contributed to third parties who administer the benefit, the employer can only claim credit for the per hour cost of the economic benefits paid.  The formula that L & C uses to calculate the holiday pay contributions for its employees is undisputed:  The monthly contribution made on behalf of the employee is multiplied by 12, and then divided by the total number of hours worked by the employee for the year, which equals 2080 minus 8 hours per personal or holiday day received.  (PFOF ¶109)  L & C has failed to correctly calculate the health insurance contribution rate for Plaintiff Knudson.  For example, for the time period between January and the end of April of 2011 Knudson did not have any personal or holiday benefits, and his per month health insurance cost was $294.42.  His hourly insurance cost was therefore $294.12 times the 12 months, and divided by 2080 hours, or $1.70. (PFOF ¶110) L & C therefore violated Wisconsin prevailing wage laws by

29

taking a health insurance credit of $1.80 on prevailing wage projects worked by Knudson during that time period, as well as during any other time periods when its calculation was incorrect.  (PFOF ¶111)

In addition to the benefits listed on the annual reviews, L & C also claimed a $0.45 per hour credit for its contributions to a training trust set up with the ABC Apprenticeship Committee. (PFOF ¶112) These contributions do not constitute bona fide fringe benefits for two reasons:  That they do not represent the per hour cost of economic benefits paid to the plaintiffs, and the contributions were not made pursuant to (i.e. consistent with the rules) of a bona fide program.

By stating that fringe benefits must represent the per hour cost of economic benefits paid to the employee, §290.01(10) makes clear that the employee must be the one who benefits from the benefit contribution.  An employer that sponsors a self-funded plan could not for example claim the same health insurance contribution for all of its employees regardless of whether they are covered by the company plan, and regardless of whether they elected single or family coverage.  Federal court decisions interpreting parallel provisions of federal prevailing wage laws support the same conclusion. *Tom Mistick & Sons v. Reich*, 54 F. 3d 900, 904 (D.C. Cir. 1995) (Employer can claim prevailing wage credit for a contribution only if the employee eventually receives the full value of each dollar contributed on his behalf); *U.S. v. Coren*, 2008 U.S. Dist. Lexis 71564 *15 (E.D. NY. 2008) (Citing to, and following DOI opinion that payments made on behalf of one employee cannot satisfy employer obligation to pay prevailing wages to a second employee).  Similarly, during the course of the plaintiffs'

30

employment the trust fund only reimbursed the costs of annual apprenticeship fees and ABC skill competitions only attended by apprentices recognized by the State of Wisconsin.  (PFOF ¶114)   Since the plaintiffs never became bona fide apprentices during their tenure at L & C, they did not receive any benefits from contributions made to the training trust fund for prevailing wage hours that they worked. (PFOF ¶115)  L & C cannot claim a prevailing wage credit for contributions from which the plaintiffs did not derive any economic benefit.

Even if L & C can claim credit for contributions that never benefitted the plaintiffs, the amount of the benefit it claimed was improper, since it was inconsistent with the governing documents and rules for the trust fund.  By  providing that contributions must be made pursuant to a bona fide program, DWD §290.01(10)(b) requires L & C to follow the rules of the bona fide program in making contributions to the trust fund.  While L & C maintained the practice of only making trust fund contributions for prevailing wage projects worked by its employees, which is a small subset of the total number of hours worked by its employees, in fact ABC's rules provide in bold:

> Credit calculations must be made on all field hours worked in a particular trade, not just hours on the prevailing wage or Davis Bacon Work.

PFOF ¶116.  A separate ABC document titled "Trust Contributing Basics" similarly provides that the credit calculation for the amount of prevailing wage credit that can be taken for the trust fund contributions must be on all hours worked. (PFOF ¶117) Gauchal admits that L & C's policy of calculating the trust fund contribution credit based on the employees' prevailing wage hours worked, rather than their total hours worked is inconsistent with ABC's rules. (PFOF ¶118)  Therefore, even if L & C can claim a credit

31

against the plaintiffs for the trust fund calculations, the denominator used to calculate the credit must be the total number of hours worked by L & C employees, rather than the total number of prevailing wage hours worked by L & C employees.

7.    Conclusion.

For the above stated reasons, the Court should grant partial summary judgment for the plaintiffs, and find that L & C has violated the FLSA and Wisconsin law as alleged in the motion, specifically:

1.    The Plaintiffs' time spent attending unpaid training including the Fundamentals of Crew Leadership class, OHSA training, First Aid/CPR Training, and Firestop Training was compensable, and must be treated as hours worked under both the Fair Labor Standards Act and Wisconsin law.

2.    The Plaintiffs' time spent attending Nestle training and Friday training was compensable under both the Fair Labor Standards Act and Wisconsin law, so that L & C was required under both the Fair Labor Standards Act and Wisconsin law to count the time spent in Nestle training and Friday training as hours worked, for the purpose of calculating the plaintiffs' eligibility for weekly overtime for working over 40 hours per week.

3.    The Plaintiffs' time spent completing take home tests, which were assigned to them during L & C's Friday classes, was compensable and must be treated as hours worked under both the Fair Labor Standards Act and Wisconsin law.

4.    The Plaintiffs' time spent studying and memorizing materials from chapters taught during L & C's Friday classes, for the purpose of passing the tests that

were given during the Friday classes, must be treated as hours worked under both the Fair Labor Standards Act and Wisconsin law.

following legal issues, and as follows:

5.     Under the Fair Labor Standards Act L & C was required to pay the plaintiffs for all of their travel time, on trips during which they had an overnight stay away from home, if the traveling occurred during their regular hours of work.

6.     Under the Fair Labor Standards Act, pursuant to an established custom or practice L & C must pay the plaintiffs for all of their travel time on trips where they had an overnight trip away from home, as well as all of their travel time on trips where they traveled more than 2 hours one way away from their homes, regardless of when during the day or night the traveling occurred.

7.     Under Wisconsin law L & C was required to pay to the plaintiffs travel pay for all of their time traveling on trips where they were eligible for a company paid motel stay away from home (i.e. 90 miles away from their homes), regardless of whether they had overnight stays away from home, and regardless of when during the day or night the traveling occurred.

8.     Under Wisconsin law L & C was required to calculate the overtime premium as one half of the average hourly wage rate earned by the employee during the workweek, rather than as one half of the regular rate of pay for the work that the employee performed during the overtime hours.

9.     Under Wisconsin prevailing wage laws L & C cannot claim its personal, holiday, and apprenticeship contributions as bona fide fringe benefits, so that it owes to

33

the plaintiffs wages equal to the personal, holiday, and apprentices contribution credits that it claimed for their hours of work on prevailing wage projects.

10.    For Cole Knudson and for the time period preceding April 30, 2011, L & C could only claim a health insurance contribution of $1.70 for the hours Knudson worked on Wisconsin prevailing wage projects.

Dated this 30th day of January, 2014.

s/Yingtao Ho
MARIANNE GOLDSTEIN ROBBINS
Wisconsin State Bar No. 1015168
YINGTAO HO
Wisconsin State Bar No. 1045418
The Previant Law Firm, S.C.
1555 N. RiverCenter Drive, #202
P.O. Box 12993
Milwaukee, WI   53212
Phone 414/271-4500
Fax 414/271-6308
mgr@previant.com
yh@previant.com
Attorneys for Plaintiffs