## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN
_____

**Jeremy Wicke**
**Shawn Simmons**
**Cole Knudson**


**v.**                                              **Case No. 12-CV-638**


**L & C Insulation, Inc.,**
_____ _____


## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT
_____

### I.      Introduction.

Once the plaintiffs meet their initial burden of proof on summary judgment, by presenting sufficient evidence that if uncontroverted would support a directed verdict on the issue of liability at trial; the burden falls upon L & C to designate specific facts to demonstrate its entitlement to a trial.  Far from disputing the plaintiffs' assertions of material facts, L & C has instead based its defense against the plaintiffs' motion for summary judgment on legal arguments that are appropriate for resolution on summary judgment.  With respect to each of the plaintiffs' claims for compensation, the record demonstrates that the plaintiffs lost compensation as a result of L & C's application of its unlawful compensation policies, and contains undisputed facts which establish, as a matter of law, that L & C's challenged compensation policies were unlawful.  The plaintiffs are therefore entitled to summary judgment on each of their claims establishing that L & C's compensation practices were unlawful, and that the plaintiffs are entitled to damages, in an amount to be determined, for all wages lost as a consequence of L & C's unlawful compensation practices.

## II.     Argument.

A.   ONCE THE PLAINTIFFS MEET THEIR INITIAL BURDEN OF PRODUCTION, THE SAME SUMMARY JUDGMENT STANDARD IS APPLICABLE FOR ALL MOVING PARTIES.

L & C misstates the law by claiming that when a party with the burden of proof at trial moves for summary judgment, it faces a higher burden of proof throughout the summary judgment process.  Rather, the difference is limited to the initial burden of production faced by the party moving for summary judgment.  *Select Creations v. Paliafito Am.*, 911 F. Supp. 1130, 1149-1150 (E.D. WI. 1995).  To satisfy its initial burden of production on summary judgment, the party with the burden of proof at trial must produce sufficient evidence that, if un-contradicted, would support a directed verdict in its favor at trial.  *Celotex v. Catrett*, 477 U.S. 317, 331 (1986).  Once the initial burden of production is met, the same burden is faced by the party opposing summary judgment, regardless of whether it has the burden of proof at trial:  It must go beyond the pleadings, designate specific facts supporting each element of its cause of action, and demonstrate that issues of fact remain for trial.  *Select Creations*, 911 F. Supp. at 1150.  In the case at bar, the plaintiffs have presented undisputed material facts that when applied to the applicable law establish that L & C's challenged compensation practices were unlawful.  Summary judgment for the plaintiffs is appropriate, when L & C's responses to the plaintiffs' case primarily consist of erroneous legal arguments; and do not present material factual disputes that require resolution at trial.

L & C is equally incorrect in its argument that the plaintiffs' motion for summary judgment should be denied because they are not requesting summary judgment on the issue of damages.  L & C's argument is directly contrary to the plain language of Rule 56(d)(2), which provides:

> An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages.

The Seventh Circuit has consistently followed the rule by upholding the district courts' grant of summary judgment on the issue of liability, even though following the grant of summary judgment the district courts still needed to hold evidentiary hearings on the issue of damages. *Williams v. Rohm & Haas Pension Plan*, 497 F. 3d 710 (2007); *Blue Ribbon Feed Co. v. Farmers Union Cent. Exchange*, 731 F. 2d 415, 419-420 (7th Cir. 1984). The Court's scheduling order similarly recognized that liability issues are distinct from damages issues, by providing for a bifurcated trial. (Docket #27, pg. 5) Therefore, so long as the plaintiffs meet their initial burden of production of establishing sufficient facts to support a directed verdict in their favor at trial on the issue of liability, they are entitled to summary judgment on the issue of liability, unless L & C can point to material factual disputes that require trial.

    B.    <u>THE PLAINTIFFS ARE ENTITLED TO BE PAID FOR THEIR UNPAID TRAINING</u>.

    1.    <u>The Four Prong Test for Determining Whether Training is Compensable is Applicable</u>.

The four prong test for determining whether training is compensable, as set out by 29 C.F.R. 785.27 and its Wisconsin counterpart, DWD §272.12(2)(f)1, are applicable unless the training is either a hiring prerequisite that the employee is required to fulfill subsequent to his hiring, or if the training is required by law. Undisputed facts establish that neither exception is met in the case at bar.

L & C stretches the hiring prerequisite exception beyond its breaking point, by claiming that all training that teaches the plaintiffs the insulation trade fall is within the exception, regardless of whether completing the training was a prerequisite for the plaintiffs' hiring.

Rather, the hiring prerequisite exception applies only when the employee is told prior to his hiring that he must complete the training as a condition of his hiring and termination would follow if the employee failed to complete the training subsequent to his hiring. The three cases cited by L&C confirm the strict requirement for a hiring prerequisite.  In *Chao v. Tradesmen International Inc*., 310 F. 3d 904, 909 (6th Cir. 2002) the dispositive facts are that employees committed at the time of hire that they would complete the OSHA 10 training within a reasonable period of time, , and the employee faced termination for failing to complete the training.  In *Bienkowski v. Northeastern University*, 285 F. 3d 138 (1st Cir. 2002) employees at time of hire signed a letter stating that they must receive EMT certification within one year of their appointment; and were, in fact, hired on a probationary basis, and were not permitted to hold the job on a permanent basis until EMT training is completed. In *Ballou v. General Elec. Co*., 433 F. 2d 109 (1st Cir. 1970) apprentices and trainees were required by their employment contracts to attend and make satisfactory progress in classes, and faced dismissal for failing to attend and make satisfactory progress at classes.

The case at bar present undisputed facts, which are materially different from the facts in *Chao, Bienkowski*, and *Ballou*.  First, there is no dispute that L & C through its owner Peter Gauchel has never told anyone that completion of insulator training was a prerequisite for their L & C employment.  (PFOF ¶37)  The case at bar is thus a far cry from cases cited by L & C, where employees were told pre-hire that the training was a prerequisite for their employment. Second, in each case cited by L & C the employee was not permitted to hold the job on a permanent basis, unless he completed the training that was a prerequisite to his hiring.  In contrast, in the case at bar employees were required to take the classes, but the consequence for the employee's failure to attend and make satisfactory progress in classes is ineligibility for

4

scheduled wage increases. (PFOF ¶61, 64, 75-76) Under the policy that existed while the plaintiffs were employed, no other disciplinary consequences would follow if the employee was kicked out of the training program.  (Plaintiff response to L & C PFOF #15)  The unpaid training at L & C is not a prerequisite for the employee's hiring when L &C never told any of the plaintiffs that the training is a hiring prerequisite, they were not on probation until training was completed.  Rather, they as employees were directed to take the class and were subject to loss of regular increases if they failed to attend.

L & C fares no better with its argument that OSHA training is required by law.  During his deposition, L & C owner, Peter Gauchel admitted that no L & C jobs required an employee to obtain OSHA certification, before they are permitted to work on projects.  (Id #17)  Gauchel's admission is further supported by his admission that L & C only tries to get employees signed up for OSHA training in their first year of employment, that L & C may have a few employees who have never completed OSHA training, and by the fact that Wicke has never completed OSHA 10 training despite working for 4 years at L & C. (Id.)  L & C would have displayed far more urgency in signing its employees for OSHA training, if government regulation required the training, before  its employees could work on jobsites.  Simmons' deposition testimony is not to the contrary, since he does not state the basis of his understanding or whether the requirement to complete OSHA 10 training came from L & C or a government regulation.  (Response to L & C PFOF ¶1)

Moreover, the issue of whether L & C employees needed to complete OSHA 10 training to work on jobsites is a question of law that can be resolved by reviewing applicable regulations, rather than a question of fact that may present a credibility dispute.  In order to cover up its inability to find any authority requiring OSHA certification before the plaintiffs can work on

5

jobsites; L & C instead cites to the hundreds of regulations under 29 C.F.R. §1926, and OSHA Publication 2254, a 110 page document; without providing a single pin cite to support its claim that OSHA training is required by law.   While OSHA Publication 2254 does impose some training requirements on the employer, L & C has not demonstrated that any of those training requirements are satisfied by the OSHA 10 course, especially given that it employs long term employees who never completed OSHA 10.   (Plaintiff response to L & C PFOF #17) The only provision under 29 C.F.R. §1926 that address safety training, §1926.21, does not mention OSHA 10 training by name, and does not state that any safety training is required as a precondition for working on jobsites.   Rather, undisputed facts show that L & C would frequently remind its employees of the need to work safely, and viewed OSHA training as a part of its own safety program.   (PFOF ¶69-70)  The Court should find that the OSHA 10 training was required by L & C, rather than by law.

> 2.     The Unpaid Training was Mandatory and therefore compensable.

Pursuant to both 29 C.F.R. §785.27 and its Wisconsin law counterpart, DWD 272.12(2)(f), training need not be paid only if all four parts of a four part test are established. The parts are labeled (a), (b), (c) "and" (d).   *Freeman*, supra at 15-20; *Maynor v. Dow Chemical Co.*, 671 F. Supp. 2d 902, 916 (S.D. TX. 2009) (All four requirements of §785.27 must be met, before training can be unpaid).  Training therefore must be paid unless it is "in fact voluntary: and "not directly related to the employee's job"; which are two of the four criteria that training must meet in order to be unpaid.

Unpaid training is mandatory if it is either required by the employer, or if the employee is given to understand that his present working conditions would be adversely affected by his non-attendance.  29 C.F.R. §785.28; *Maynor*, 671 F. Supp. 2d at 916; *Freeman v. Total Sec. Mgmt.*,

2013 U.S. Dist Lexis 112871 *19 (W.D. WI. 2013) (Training mandatory when employees were told by supervisors that they must attend).   In other words, training must be paid if it is required by the employer, or if the employee faces any adverse consequences for non-attendance.

Aside from a perfunctory objection to the plaintiffs' interpretation of the employee handbook, L & C does not dispute the plaintiffs' other evidence establishing that training attendance was mandatory, i.e. that the plaintiffs were instructed either through a letter from L & C's home office or their supervisor to attend unpaid training, that L & C signed the employees up for unpaid training without first contacting them, that employees were never told they could skip unpaid training, that employees were told by their annual reviews that they must attend unpaid training, and that L & C Owner Gauchel would call the plaintiffs and ask them why they did not attend, if they failed to attend unpaid training.  (PFOF ¶¶48, 52, 53, 61)  No reasonable jury can find that the training was voluntary when the plaintiffs were repeatedly told that they had to attend unpaid training, that L & C signed them up for the training without their permission, and the requirement would be reinforced and reiterated by telephone calls by L & C owner Gauchel if the plaintiffs did fail to attend unpaid training that L & C signed them up for.

L & C fares no better with its argument based on the employee handbook.  The handbook contains separate provisions addressing company or department meetings on the one hand, and special meetings on the other hand.  (PFOF ¶34)  Special meetings are different from company or department meetings in that while everyone in the company or department must attend those meetings, only those who are notified must attend special meetings. (Id.)  Since the two provisions are written in the disjunctive, they do not support L & C's interpretation that only company or department meetings can be special meetings.  Indeed the straight forward reading of the handbook is that special meetings are neither company or department meetings. Nor does

7

any language in the provision limit special meetings to those exclusively attended by L & C employees.   Whether an employee is required to attend training must be evaluated from the employee's reasonable understanding.   29 C.F.R. §785.28; DWD §272.12(2)(f)(2).   Since the plaintiffs were notified by L & C they had   to attend the unpaid training, they reasonably understood the unpaid training to be special meetings that they were required by L & C's handbook to attend.

Since it is established that plaintiffs were required by letter documentation and verbal direction to attend unpaid training, it is not required by the applicable legal standard that they also establish they faced adverse consequences for their non-attendance of unpaid training.   29 CFR § 785.28. The undisputed facts, however, establish they did face adverse consequences.   No reasonable fact finder can conclude that L & C 's policy of penalizing employees for not attending unpaid training by requiring them to reimburse L & C for the costs of unpaid training was limited to the OSHA 30 class.   During his depositions, Gauchel testified that the policy on reimbursement of training costs applied to both trainees and apprentices, and that the OSHA 30 course is only taken when the employees are on the verge of becoming journeymen.   (Plaintiff Reply to L & C PFOF #56)  Since L & C is permitted to have a limited number of apprentices at any one time, trainees become apprentices only when openings are available.  (Id.).  The Court should also take judicial notice that an insulator apprenticeship is four years.  (Id.)  None of the plaintiffs were apprentices. (PFOF ¶39) By testifying at his deposition that the reimbursement policy applied to both trainees and apprentices, Gauchel admitted that the reimbursement policy was not limited to the OSHA 30 class, since trainees, who are years away from becoming journeymen, would not take the OSHA 30 class.  Gauchel's inconsistent declaration testimony

8

therefore should be disregarded.  *Adusumilli v. City of Chicago*, 164 F. 3d 353, 360 (7th Cir. 1998).

L & C does not dispute the plaintiffs' argument that the reimbursement requirement would reduce their take home pay, so that the plaintiffs' present working conditions would be adversely affected by their non-attendance at unpaid training.  *See also Fowler v. Incor*, 2009 U.S. Dist. Lexis 10841 *21-22 (E.D. OK. 2009) (Training mandatory, in part, because employees were charged a $25 no-show fee for failing to attend training).  Arguments not responded to by the opposing party are deemed waived.  *Retzlaff v. City of Cumberland*, 2010 U.S. Dist Lexis 42957#4 (W.D. WI. 2010).  The reimbursement requirement therefore makes unpaid training attended by the plaintiffs mandatory and compensable.

Undisputed facts further establish that plaintiffs are told in their annual evaluations that they must attend unpaid training, as a part of the blueprint for them to receive wage increases. (PFOF ¶58)  Undisputed facts further establish that every employee at L & C receives a wage increase every year.  (PFOF ¶64-65)  When employees' conditions of employment include the expectation that they receive wage increases, denial of a wage increase is an adverse employment action.  *Haugerud v. Amory Sch. Dist.*, 259 F. 3d 678, 692 (7th Cir. 2002); *Allen v. City of Chicago*, 2011 U.S. Dist. Lexis 26265 *8 (N.D. IL. 2011). An adverse employment action must involve a substantial and material adverse change, *Maclin v. SBC Ameritech*, 520 F. 3d 781, 789 (7th Cir. 2013).  Denial of an expected pay increase, as an adverse employment action, therefore constitutes a substantial and material adverse change to the employee's terms and conditions of employment.  Such an adverse change necessarily also constitutes a change to the employee's present working conditions, thus satisfying the requirement of §785.28 for making the training mandatory.      L & C fares no better by pointing to Wicke's deposition

testimony, and claiming that Wicke suffered no adverse consequences from not attending OSHA 10 training.  Wicke did not inform L & C that he did not attend OSHA 10 training, and consequently was never signed up by L & C for OSHA 10 training.  (Plaintiff Reply on PFOF #59)  The fact Wicke did not attend a class, because L & C did not identify him as needing the class and therefore did not require him to attend, does not illustrate that the plaintiffs were not required by L & C to attend the classes when they were so identified.

3.    The Unpaid Training Was Directly Related to the Plaintiffs' Present Employment.

Training is compensable if it is either mandatory or if it is directly related to the plaintiffs' employment.  Since the plaintiffs' unpaid training was as argued above mandatory, the Court need not separately consider whether the training was also directly related to the plaintiffs' jobs.

Training is directly related to the employee's job, if it is designed to enable the employee to handle his current job better.  29 C.F.R. §785.29.   Courts have interpreted the provision to mean that training is directly related to the employee's present employment, when it is designed to teach the employee *a new skill* that he needs in his current job.  *Misowicz v. City of Memphis*, 2012 U.S. Dist. Lexis 43139 *59 (E.D. TN. 2012) (Paramedic training directly related when employees were hired to be paramedics, though they had not yet performed any paramedic duties); *Donovan v. USPS*, 1981 U.s. Dist. Lexis 17145 *40 n. 20 (D. D.C. 1981) (Directly related when training taught the employee new knowledge, which he needs for a new duty assignment in his existing job).  The sole case cited by L & C, *Dade County v. Alvarez*, 124 F. 3d 1380, 1385 (11th Cir. 1997) is easily distinguishable because that case dealt with physical fitness training to retain the fitness level that was a prerequisite to the officers' employment, rather than training offered to employees subsequent to their hiring.

Applying the correct standard, all of the unpaid training attended by the plaintiffs were directly related to their present job as insulators.[1]   The firestop training taught Wicke how to install firestop materials that he would use in his day to day work as an insulator, and is therefore exactly like the example of a stenographer taking a stenography class referenced in 29 C.F.R. §785.29.  (PFOF ¶72)[2]   The OSHA 10 class that Knudson and Simmons were required to take taught them how to work more safely in their existing job as insulators, while the First Aid/CPR class taught the plaintiffs how to prevent and minimize worksite injuries while working for L & C as insulators. (Id. ¶68, 71) While L & C asserts in general that the Leadership class taught leadership, it also concedes that the Leadership Class taught the plaintiffs how to organize their materials better, how to accomplish their job tasks more efficiently, and how to communicate more effectively, all of which are new skills that enable them to work more effectively in their present employment as L & C insulators. (Id. ¶66)

All of the plaintiffs' unpaid training therefore is compensable under both the FLSA and Wisconsin law.

C.   L & C WAS REQUIRED TO COUNT THE PLAINTIFFS' HOURS WORKED IN PAID TRAINING TOWARDS THERE ELIGIBILITY FOR WEEKLY OVERTIME PAY.[3]

 L & C paid the plaintiffs for their time attending Friday class and Nestle Training, but refused to count their time attending the class and training towards their eligibility for weekly overtime pay.  (PFOF ¶25, 30) Recognizing that its refusal to count compensable time towards

---

[1] L & C does not claim that it maintained  separate job titles for its employees such as trainees, apprentices, and journeymen.  In fact, from the employee evaluations it is impossible to tell whether one is a trainee, apprentice, or a journeyman.  (Docket #154, Ex. 8)  In any case, plaintiffs were not apprentices. (PFOF para. 39)

[2] In fact, there is no logical basis to distinguish the Firestop training from Nestle training that L & C concedes is compensable under the law.  The Nestle training was required for the employees to perform their existing job as insulators at the Nestle plant.  (Docket #168,  pg. 93)

[3] Since overtime pay may be paid at at a higher rate under Wisconsin law than the FLSA, the settlement of Simmons and Knudson's FLSA claims does not exclude them from claiming additional overtime pay for their training time.

overtime is not justifiable, L & C instead bases its defense on baseless procedural defenses that should be summarily rejected by the Court.

First, L & C complains that the issue of failure to count working hours towards overtime pay eligibility was not raised in the complaint. However, the Second Amended Complaint specifically alleged that L & C violated federal and Wisconsin law by failing to pay the plaintiffs for all hours over 40 per week shown on their paychecks. (Docket #68, ¶54, 57-58) The complaint therefore included all instances where L & C (regardless of the reason) failed to count hours worked, as acknowledged on employee paychecks, towards their eligibility for overtime pay. The plaintiffs' overtime claims regarding paid training therefore are encompassed within the Second Amended Complaint. L & C acknowledged this, when it did not object to plaintiff counsel's questions concerning L & C's failure to count Friday class and Nestle training towards the plaintiffs' eligibility for weekly overtime pay. (Docket #167, pg. 90)

L & C's only other defense to the overtime claim is its allegation that the Friday training, though paid by L & C, was not compensable under the law. L & C's argument is both illogical, and is incorrect: The Friday classes cannot constitute a hiring prerequisite that the employees could fulfill subsequent to their hiring when the plaintiffs were never told that they were prerequisites[4], and when an employee would not face termination if he was kicked out of L & C's training program. (PFOF ¶21-22; Plaintiff Response to L & C PFOF #15) L & C clearly did not require completion of the Friday classes as a precondition of the plaintiffs' employment; though it did discipline the plaintiffs by withholding scheduled wage increases for their non-attendance.

---

[4] L & C alleges that the plaintiffs were told about training opportunities at L & C prior to their hiring. (Response to PFOF ¶22, 23) Those allegations do not, establish that the plaintiffs were told they needed to complete the described training as a condition of their hire, which is required before L & C can claim the exemption created by cases such as *Chao* and *Bienkowski*.

12

Undisputed facts establish that the plaintiffs were expected to attend Friday training, would be contacted by Gauchel if they failed to attend, and that the plaintiffs' annual reviews specifically listed the training classes as an area that they had to work on, as a blueprint for receiving future scheduled and expected wage increases. (PFOF ¶48, 52, 53, 61)  The employees therefore reasonably understood that training attendance was mandatory.  The understanding is further supported by the employee' handbook, which provides that special meetings  are to be attended by those who are so notified, and does not limit special meetings to company or department wide meetings.  (PFOF #50)  Unlike some other unpaid training, Friday classes are only attended by L & C employees, so L & C cannot argue Friday classes somehow are not special meetings because employee of other employers are present. (PFOF ¶36)  Gauchel's declaration assertion that the training was not mandatory is a legal conclusion, and is not entitled to consideration at the summary judgment stage, since a lay witness's opinion on a question of law is not admissible at trial.  *Liberles v. County of Cook*, 709 F. 2d 1122, 1129 (7th Cir. 1983). Plaintiffs reasonably understood the Friday training to be mandatory, when they were expected to attend, and when the attendance requirement would be reinforced by Gauchel, if they did fail to attend Friday training.[5] (PFOF #33)

Paid training is clearly and closely related to the plaintiffs' current jobs as L & C insulators.  L & C admits that the Friday training taught the plaintiffs skills that they needed in their L & C employment, as well as made them more knowledgeable about the materials and

---

[5] Since training was mandatory, plaintiffs need not additionally demonstrate that they would suffer adverse consequences from failing to attend training. (see reply brief, pg. 6).  In any event, in his deposition Gauchel testified that he was not sure whether an employee who was current on the tests by passing take home tests, but failed to attend any of the classes would have his wage increase affected.  (Docket #169, pg. 50)  In fact, L & C does require class attendance on the plaintiffs' annual reviews, which are blueprints for them to receive future wage increases. (PFOF ¶60) As argued above, denying the plaintiffs scheduled wage increases constitutes an adverse change to their present working conditions.

13

installation processes that they used during their L & C employment.  (PFOF ¶40, 41)  The undisputed facts therefore show that the Friday classes taught the plaintiffs skills and knowledge that they needed to use in their employment as L & C insulators, rather than skills for a different job.  The Friday classes therefore are compensable regardless of whether they were mandatory. 29 C.F.R.§785.27.

Finally, while conceding that paid Nestle training is compensable, and therefore contrary to its practice must be included in calculating overtime pay eligibility, L & C disputes whether any of the plaintiffs attended Nestle training.  However, the existing summary judgment record demonstrates that both Simmons and Knudson attended Nestle training.  (Plaintiff Reply on PFOF #30)  The Court should therefore find that the Nestle training was compensable, and then as part of the damages proceeding determine the amount of damages owed to the plaintiffs, because L & C failed to count Nestle training towards overtime.  Moreover, the plaintiffs did suffer a loss of overtime pay, as a result of L & C's failure to count Nestle training towards overtime.  See for example Simmons for week ending May 6, 2012. (Id.)

C.   AS A MATTER OF LAW THE PLAINTIFFS' STUDYING TIME WAS COMPENSABLE.

L & C does not even claim that passing the tests given during Friday classes was a hiring prerequisite that the plaintiffs could fulfill subsequent to their hiring, and the parties agree that *Mory v. City of Chula Vista*, 2010 U.S. Dist. Lexis 100777 (S.D. CA. 2010) defines the proper standard for determining whether the plaintiffs' off-duty studying time was compensable. L&C's reliance on *Mory* misses the critical holding in the case, that where an employer makes requirements of its employees and the employees must use off duty time to meet the requirement, that off duty time is compensable. Thus in *Mory* both off duty maintenance of weapons and of

14

the uniform were compensable because they were necessary to meet the employers requirements; and because the maintenance had to be done using the employees' off-duty time.    "It is undisputed that Defendant's Recruit Policy and Procedure Manual required Plaintiff to maintain her uniform according to certain specification" *Mory v. City of Chula Vista*, 2010 U.S. Dist. LEXIS 100777  p. 24 . "Recruits shall clean [their] weapons . . . after each use, and maintain them in a manner which meets Academy standards. The cleaning of weapons on campus is prohibited." *Id* at p. 25.  Off-duty time necessarily spent by the employee to meet employer requirements therefore is compensable, despite the employee's choice of when during his or her off-duty time to complete the employer requirements.

Applying the standard of *Mory*, the plaintiffs' time spent completing take home tests was compensable.  Undisputed facts establish that the plaintiffs' eligibility for wage increases was conditioned on them completing take home tests, and that the plaintiffs could not spend their time during their work and class time to complete take home tests. [6]  By conditioning scheduled and expected wage increases on the plaintiffs' passing the take home tests, L & C required the plaintiffs to complete and pass the take home tests.  Nor can L & C successfully argue that the plaintiffs faced more drastic consequences for failing to complete firearm and uniform maintenance in *Mory*.  The opinion in *Mory* made no reference that the plaintiffs could not graduate from the police academy unless they fulfilled the uniform and firearm maintenance

---

[6] L & C tries to contradict this undisputed fact by pointing to a typographical error in the transcript of the L & C deposition.  The reporter recorded the question as: "But when you give a take home test, there would be time during the class to complete the test, right", when the question in fact was "there wouldn't be time during the class to complete the test", just like the immediate next question was there wouldn't be time during work time to complete the take home tests.  Earlier on the same page of the transcript Gauchel admitted that employees would complete the take home tests at home.  The context clearly establishes that the question pointed to by L & C was a typographical error, and that Gauchel in fact testified that there wouldn't be time during class to complete the take home tests.  In his later personal deposition, Gauchel again confirmed that employees would not have time during class to complete take home tests.  (Plaintiff reply to L & C PFOF #78)  No reasonable jury can therefore find that the deposition cite by L & C was anything other than a typographical error by the reporter.

requirements.  The word "graduate" appears nowhere in the opinion.  The plaintiffs are entitled to summary judgment when undisputed facts establish both that they were required to pass the take home tests, and that they had to use their off-duty time to complete the take home tests.

L & C similarly conditioned the plaintiffs' scheduled wage increases on them passing their in-class tests, thereby requiring the plaintiffs to pass their in class tests. (PFOF ¶75)  Off-duty studying time for the tests is compensable if the plaintiffs had no choice but to use their off-duty time to study, in order to pass the tests.  *Mory, supra.  See by analogy Kosakow v. Rochelle Radiology Assoc.*, 274 F. 3d 706, 721-722 (2nd Cir. 2001) (Training mandatory when the employer required the employee to maintain a certification, which she could not maintain without attending training during her off-duty time). The study time claim in *Mory* is distinguishable, because no showing was made in that case that employees must use their off-duty time to study to pass the tests.

In contrast, in the case at bar the plaintiffs faced closed book tests that tested both their recollection of, and their comprehension of the materials taught, which may be 25-40 single spaced pages in length.  (PFOF ¶86, 89-90)  L & C has in fact conceded that the plaintiffs cannot remember everything that Gauchel goes over in his lectures.  (PFOF ¶91,94)  Its expectation was limited to that the employees could remember 70% of the lectures.  (L & C Response to PFOF #86, 87)  However, there is no guarantee that the test questions are evenly distributed, so that the 30% of the lecture that the employee cannot remember without studying may, for example, contain answers to half of the test questions.   There is thus no guarantee that the 70% of the lecture that the employee can remember would allow him to answer 70% of the test questions correctly; especially since Gauchel has admitted that his lectures do not cover every test question.  (Plaintiff response to L & C PFOF #76)  Since the plaintiffs could not count on

16

remembering enough of the lectures to pass their closed book tests, they had no choice but to use their off-duty time to study, in order to fulfill L & C's requirement that they pass the tests. The plaintiffs' time spent studying therefore is compensable.

D.     WICKE IS ENTITLED TO DRIVE PAY UNDER THE FLSA.

Even though every court that has considered the issue has enforced 29 C.F.R. §785.39 as written, including the court in the *Bassett v. Tennessee Valley authority*, 2013 U.S. Dist. Lexis 83203 (W.D. Ky. 2013) case cited by L & C, L & C argues without any citation to authority that §785.39 is somehow invalidated by the general presumption that home to work commute time is not compensable. In fact, there is nothing incompatible between the general presumption that home and work commute time is not compensable, and the rule in §785.39 that overnight travel between home and work is compensable, when the travel cuts across the employee's normal working hours:   Home to work travel is not compensable, unless the travel meets the requirements of an established exception, such as the exception for travel away from the home community. The Court should enforce §785.39 as written, just like every court that previously considered the same issue. The plaintiffs agree that under §785.39, travel time is compensable only when travel occurred during Wicke's normal working hours.

Next, L & C argues, again without any citation to authority[7], that on overnight trips Wicke's normal work time starts when he begins working on a jobsite, and ends when he finishes working on a jobsite. An identical argument was made and rejected in *Mendez v. Radec Corp.*, 232 F.R.D. 78, 86-87 (W.D. N.Y. 2005). In that case, the court held that even though the plaintiffs' work hours varied drastically from job to job, they did have normal working hours on specific jobs. Similarly, if at L & C the employees worked on a week long project, and on

---

[7] The factual issue of whether the plaintiffs drove during their regular working hours was not considered nor decided in *Basset*, the sole case cited by L & C.

Monday and Friday drove during hours that they spent working on the jobsite between Tuesday and Thursday, then the Monday and Friday drive time occurred within their normal working hours.  Wicke's declaration establishes that this in fact occurred to him, when he had a later start time on the first day of projects that were far from the leadman's home.  (Id.) Therefore Wicke is entitled to summary judgment on liability for violation of the FLSA when his drive time during his regular work hours to overnight assignments was not counted as hours worked.

L & C does not dispute that pursuant to DWD §272.11, it was required to maintain records of when its employees began and finished working, and that it had failed to do so. (PFOF  ¶17)   Since the plaintiffs drove immediately before they started working, and immediately after they finished working on jobsites, knowing the approximate length of the drives and the times when the plaintiffs began and finished working on the jobsites permits reconstruction of when during the day the plaintiffs drove.  (Plaintiff Reply on PFOF #16).  L & C's failure to maintain legally required time records permits the Court to infer, as a matter of just and fair inference, when Wicke drove during his normal working hours.  *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680 (1946).

Such an inference can be made, for example, for Wicke during the week ending January 22, 2012.  During that week Wicke worked on the same jobsite in Chippewa Falls on Tuesday through Thursday, which is located approximately 1.5 hours from his home, and between Wausau and La Crosse.   He worked 10 hours per day on the jobsite on Tuesday and Wednesday. On Thursday Wicke worked on the jobsite for 7.5 hours, then drove to Lacrosse for Leadership class, before staying in La Crosse overnight, as shown by the fact that he claimed a meal for Thursday night.  (Plaintiff Reply on PFOF #16; Ho Supp. Dec. Ex. 2)  Assuming as a matter of just inference pursuant to *Anderson* that Wicke started working on the jobsite at the same time on

18

Tuesday through Thursday, and that Wicke started his drive to La Crosse immediately after he finished working on Thursday, the 2 hour drive Wicke made on Thursday between the jobsite and La Crosse occurred during his regular working hours for the project.  Since even not counting the drive time Wicke already worked 40 hours for the week, counting the drive as hours worked would have entitled Wicke to overtime pay under the FLSA that he did not in fact receive.  (Id.)

The parties' dispute over the FLSA travel pay claim is not a hypothetical one; Wicke did suffer damages because L & C failed to count his drive time during normal working hours on an overnight trip towards overtime eligibility.  The Court should rule that L & C was required by the FLSA to count as compensable all of Wicke's drive time on overnight trips, when the driving occurred during normal working hours.

L & C additionally violated the FLSA by excluding from compensation Wicke's first two hours of driving time each way, even though by its own custom and practice such trips are compensable.  The issue presents a pure question of law, and is governed by *Wirtz v. Sherman Enterprises*, 229 F. Supp. 746, 753 (D. MD. 1961). In that case, the employer had a custom of paying $1 per 40 miles driven by the plaintiffs on a trip that is not required by the FLSA to be compensable.  The Court applied 29 U.S.C. §254(b), and held that once the employer treated the trip as compensable under the FLSA, its payment obligation on the trip was to pay the minimum wage for the entire trip, rather than solely to pay the amounts required by custom.  Similarly, L & C pays drive time for the portion of trips that exceeds two hours each way; and therefore by custom defined as compensable the activity of driving more than two hours away from home, regardless of when during the day or night the driving occurred.  (PFOF ¶10, 11).  L & C's obligation under §254(b) is to pay the compensable activity in a manner consistently with the

19

FLSA, so that its payment obligation is not limited to payments required to be paid by its own policy.

Section §785.37 upon which L & C relies is inappropriate.  The regulation states it only applies to situations where an employee who works at a "fixed location" in one city is given a special assignment in another city and therefore § 785.37 permits the employer to exclude from compensation a portion of an otherwise compensable trip .  It, however, does not apply to Wicke because he did not have a fixed location of work and his assignments were not limited to one day (PFOF).  No other provision of FLSA regulations permit the employer to exclude a portion of a compensable trip from compensation.  Since §785.39 requires L & C to pay the plaintiffs for all travel time on trips away from their home communities, L & C cannot, as it claims it can in its footnote, exclude the plaintiffs' first two hours of travel time from compensation on trips that it treats as compensable.

    5.    Plaintiffs are Owed Drive Pay Under Wisconsin Law.

L & C primarily bases its defense against the plaintiffs' Wisconsin  travel time pay claim on its assertion that DWD §272.12(2)(g)6, the provision stating that travel away from the home community for business purposes and away from the employer's premises must be compensated, only applies to non-commuting travel.  None of the arguments asserted by L & C in support of its interpretation of §272.12(2)(g)6 is persuasive.

First and perhaps most importantly, L & C's interpretation would render §272.12(2)(g)6 meaningless.  §272.12(2)(g)5 provides that when an employee travels between jobsites during the workday, all of his travel time is compensable; in other words all travel time aside from commuting between home and work is always compensable under Wisconsin law.  When an employee works at one jobsite, then travels to another jobsite away from his home community,

that trip is already compensable under §272.12(2)(g)5; therefore rendering §272.12(2)(g)6 superfluous and meaningless if  construed as L & C argues.   §272.12(2)(g)6 can only have meaning if it is interpreted to apply to commuting between home to work; because all trips other than commuting between home and work are already compensable under §272.12(2)(g)5.  *State v. DILJR*, 101 Wis. 2d 396, 403 (1981) (Court should avoid interpretation that would render Wisconsin statute meaningless); *Wis. Dep't of Revenue v. Menasha Corp.*, 2008 WI 45 ¶45, 311 Wis. 2d 579 (2008) (Same rules of interpretation apply to Wisconsin statutes and regulations). Interpreting §272.12(2)(g)6 to only apply to non-commuting time would render the provision meaningless in light of §272.12(2)(g)5, and is therefore an interpretation that should be avoided.

Second, comparing the titles of §272.12(2)(g)2-6 with the titles in 29 C.F.R. §785.35-§785.39 shows that the titles are identically worded and in the identical order, so that the Wisconsin regulation copied the regulation titles, and the order of the regulations, verbatim from the DOL regulations.  As shown by caselaw cited by both parties, §785.39 indisputably applies to commuting between home and work, thus strongly indicating the Wisconsin regulation which has the same title and location is also addressing home to work travel.[8]  The titles and order of the DWD regulations therefore does not carry the implications suggested by L & C.

Third, L & C is incorrect in its claim that reading §272.12(2)(g)6 to apply to commuting time would render §272.12(2)(g)4 meaningless.  §272.12(2)(g)4 only applies to commuting between home and work for special one day assignments for employees "who regularly works at a fixed work location."  §272.12(2)(g)6, on the other hand, applies to commuting between home and work when the assignment is away from the home community and lasts longer than one day;

---

[8] However, since the Wisconsin regulation uses different language than 29 CFR §785.39, the manner in which trvel is compensated follows different rules.

or when there is an one day assignment for employees, like the plaintiffs, who do not have fixed work locations.

Fourth, L & C is incorrect in claiming that applying §272.12(2)(g)6 would contradict the example given in §272.12(2)(g)5.  The example states that if an employee finishes working on the premises at 5 p.m., is sent to another job where he finishes at 8 p.m. and then goes home, the commuting time after 8 p.m. is not compensable.  The example is nothing like the case at bar, because it does not address a situation where the job where the employee worked between 5 p.m. and 8  p.m. is away from the employee's home community.  The example therefore does not contradict §272.12(2)(g)6, under which commuting time between home and work is only compensable when the work requires travel away from the employee's home community.

Fifth, L & C's position finds no support from §272.12(1)(a)2, which provides that the workday, *in general*, means the period when the employee is performing his principal activity or activities.  The DWD regulations require compensation for times when the employee is not working at all, such as when they take a break that is less than 30 minutes in duration, or if they are waiting to be engaged to perform work.  DWD §272.12(2)(b); §274.02(3).  Similarly commuting to a work location outside the employee's home community may be compensable under §272.12(2)(g)(6), even though the employee did not perform his principal activities during his drive.[9]  Moreover, even if the two provisions are inconsistent, the specific regulation takes precedence over the more general one.  *Auchinleck v. Town of LaGrange*, 200 Wis. 2d 585, 595-596 (1996).

---

[9] Moreover, §272.12(2)(g)(6) does not specify whether an employee is performing principal activities when he drives to or from a location outside his home community.

Once the Court finds that §272.12(2)(g)6 applies to commuting time only, L & C is left without much of a defense at all on the plaintiffs' Wisconsin law travel pay claim.  L & C has not disputed either the plaintiffs' legal argument that trips to and from jobsites were for business purposes and primarily for L & C's benefit, nor their factual allegation that L & C as a rule permitted employees to have company paid hotel stays, when the job is at least 90 miles from the employee's home. (PFOF #13) When employees are working within their home community it would be expected that they can return home each evening.  L & C's offer to pay for hotel rooms when employees are working at least 90 miles away from home acknowledges its employees are not expected to return home nightly, when they work at least 90 miles from home.  At L & C 90 miles is therefore the boundary to determine whether employees are working away from their home communities.   Since §272.12(2)(g)(6), unlike 29 C.F.R. §785.39, does not limit its application to instances where employees had overnight travel, or travelled during regular working hours, those limitations should not be read into the Wisconsin regulation.  *Weissman v. Tyson Prepared Foods*, 2013 WI App 109 ¶47-48, 350 Wis. 2d 280 (Ct. App. 2013) (Court should give significance to differences between FLSA and Wisconsin wage law regulations). Applying undisputed facts to interpret §272.12(2)(g)(6) presents an issue of law appropriate for resolution on summary judgment.   *Central States Pension fund v. Messina*, 706 F. 3d 874, 879 (7th Cir. 2013); *Rakowski Dist. v. Marigold Foods*, 193 F. 3d 504, 505 (7th cir. 1999) (Applying statute to undisputed facts present appropriate summary judgment issue).

L & C is incorrect in arguing that the Court should infer that the DWD is aware of, and approves of its travel pay policies; because union collective bargaining agreements also does not provide separate pay for travel time.   The case at bar is fundamentally different from cases such as *Christopher v. Smithkline Beecham*, 132 S. Ct. 2156, 2168 (2012) and *Yi v. Sterling Collision*

*Centers*, 480 F. 3d 505, 510-511 (7th Cir. 2007); where the court dealt with challenges to long term, national payroll practices for two reasons:  First, none of the cited union contracts predate 2011, so that the CBAs do not represent a long term practice.  (Docket #102, Ex. A – D). Second, there is no showing how many of the employees covered by the four CBAs work in Wisconsin as opposed to Minnesota, as well as how many of those employees who do work in Wisconsin regularly work away from their home communities.  The assumption in *Christopher* and *Yi* that the DOL must be aware of the employer's challenged practice is based upon the assumption that hundreds or thousands of employees must be subject to the employer's challenged practice, so that one or more of them must have complained to the DOT.  Since it is unknown how many employees covered by the union contracts actually worked away from their home communities in Wisconsin, the same assumption is not applicable in the case at bar.[10]  The legality of the union contracts are not before the Court; and need not be considered before concluding that L & C's practice of excluding the first two hours of travel time from compensation regardless of how far the employees drove, the only practice at issue before the Court, violated §272.12(g)6.

Nor would the plaintiffs' interpretation of §272.12(2)(g)(6) create constitutional vagueness concerns.  The sole case cited by L & C, *Karlin v. Foust*, 188 F. 3d 446 (7th Cir. 1999), dealt with a statute that affected constitutionally protected rights, so that the statute was subject to the highest possible level of vagueness scrutiny.  On the other hand, economic regulation that imposes only civil penalties faces a much looser standard, and is unconstitutionally vague only when it is substantively incomprehensible.  *Ruiz v. Commissioner*

---

[10] Under the Wisconsin contracts the higest level of reimbursement is for trips 65 miles or further to and from home. (Docket #102, ex. A, D). The contracts thus do not show Wisconsin employees covered by the union CBAS worked away from their home communities.

*of Dep't of Transp.*, 679 F. Supp. 341, 351 (S.D. N.Y. 1988).   §272.12(2)(g)(6) is not unconstitutionally vague under this standard: It provides clear notice that when the employee travels for work to a location that is away from the home community, all of the employee's travel time must be paid.   The Plaintiffs' Wisconsin travel claim therefore presents pure questions of law that should be decided in their favor, thus entitling them to summary judgment.

> F.    AS A MATTER OF LAW, UNDER WISCONSIN LAW OVERTIME PAY MUST BE CALCULATED BASED ON THE WEIGHTED AVERAGE WAGE RATE EARNED BY THE EMPLOYEE DURING THE WORKWEEK.

Wisconsin law clearly requires L & C to calculate the plaintiffs' overtime pay, using the average wage earned by the employee during the workweek.   DWD §274.03 is worded in virtually an identical manner to 29 U.S.C. §207(1), in stating that overtime compensation must equal 1.5 times the employee's regular rate of pay.   Under the FLSA, when the employee earned multiple wage rates during the workweek, the regular rate is the average rate earned by the employee during the workweek.   29 C.F.R. §778.115.    §207(g)(2) further establishes that §778.115 creates the presumption of how the regular rate should be defined, by providing that overtime pay can instead be calculated using the rate for the work the employee performed during overtime hours, but only pursuant to the employer and employee's agreement.

The Court should interpret DWD §274.03 in a manner consistently with its identically worded FLSA counterpart, and find that the "regular rate" presumably is the average rate earned by the employee during the workweek.   Unlike the FLSA, no provision of either Wisconsin statutes or the DWD regulations authorize the employee and employer to instead agree to calculate overtime pay using the rate for the work performed by the employee during overtime hours.    In interpreting DWD regulations the Court should give significance to differences between Wisconsin and FLSA regulations; and should not rewrite the Wisconsin regulation to

include the excluded FLSA regulation provisions.  *Weissman*, 2013 WI App 107 ¶48-49. Significantly, in its brief in opposition L & C does not reference *Weissman*, let alone attempt to distinguish it in anyway.

The above interpretation of DWD §274.03 is also consistent with the DWD's own interpretation.  The DWD has found that for tipped and salaried employees, overtime pay should be calculated using the average wage rate earned by the employee during the workweek.  DWD §272.03(h); *Kuhnert v. Advanced Laser Machining Inc*., 2011 WI App 23 (Ct. App. 2011).  The DWD has further provided in its online publication, Wisconsin Hours of Work and Overtime Pay (ERD-8298-C) that the same rule of calculating overtime pay using the average wage rate also applies to piece workers, who are likely employed at multiple rates during the workweek. (PFOF ¶45)  The online publication additionally provides that hourly wages, commissions, piece rates, and bonuses must all be included in calculating the employee's average wage rate (Id.); thus indicating that when employees receive multiple types of pay during the workweek, the pay must be added together, and then divided by the employee's weekly hours worked to determine the average hour rate for the workweek.  When the plaintiffs received multiple rates from L & C during a single workweek, overtime pay must be calculated using the average wage rate for the week.

Recognizing that it has no other defense for its method of calculating the plaintiffs' overtime pay, L & C claims that the DWD found no violations during a prevailing wage audit. However, there is no evidence that L & C's calculation of the correct overtime rate was an issue in the DWD's audit.  Under Wisconsin law for prevailing wage overtime the employee must receive 1.5 times the prevailing wage rate.  Wis. Stat. §66.0903(4)(b); DWD §290.05.  The rule requiring calculating overtime pay using the average wage rate therefore only applies to non-

26

prevailing wage projects; and would not be an issue in an audit concerning L & C's compliance with Wisconsin prevailing wage laws.  The Court should therefore find, as a matter of law that under Wisconsin law overtime pay must be calculated using the average wage rate earned by the employee during the workweek.

G.   L & C IMPROPERLY CLAIMED CREDIT FOR NON BONA FIDE FRINGE BENEFIT CONTRIBUTIONS.

Contrary to L & C's argument, there is no equitable exception to the application of Wisconsin prevailing wage laws.  Wisconsin prevailing wage rates are violated whenever the employer fails to pay the prevailing wage rate determined by the DWD.  Wis. Stat. §66.0903(4). Under Wis. Stat. 66.0903(11)(a)(1), employees have the right to recover all prevailing wages required by the DWD's determination; so that the entire amount of the determination must be paid through wages and bona fide fringe benefits.  The employer can satisfy the prevailing wage rate through a combination of wages and fringe benefit contributions; but only bona fide fringe benefit contributions can be considered in determining whether the employer complied with its prevailing wage obligations.  DWD §290.04.  When an employer improperly claims credit for non-bona fide fringe benefits, the employee has not received the full prevailing wage rate required by the DWD's regulation; so that he can sue for the difference as wages.

The plaintiffs are entitled to summary judgment finding that L & C cannot claim prevailing wage credit for its apprenticeship, holiday, and personal day contributions.  L & C does not dispute the legal framework governing whether the apprenticeship contributions were bona fide, i.e. that L & C can take credit for the contribution only if the plaintiffs benefited from the contributions submitted on their behalf.  *Tom Mistick & Sons v. Reich*, 54 F. 3d 900, 904 (D.C. Cir. 1995).  Gauchel's declaration claim that the training fund provided reimbursement for

the plaintiffs' training fees and materials does not create a material factual dispute, because his new claim is directly contradicted by his earlier deposition testimony.   In his deposition, Gauchel testified that L & C only applied for reimbursement from the training fund for yearly apprenticeship fees, attendance at the apprenticeship craft competitions, OSHA 10, OSHA 30, and no other training.  (Plaintiff reply on PFOF #114)  Since the plaintiffs were never official apprentices recognized by the State of Wisconsin (PFOF #39), they could not have benefited from the payment of yearly apprenticeship fees and craft compensation costs.  Additionally, the plaintiffs never attended the OSHA 30 class (L & C response to PFOF #54);  Nor were the plaintiffs included on the one occasion when L & C did apply for reimbursement for the OSHA 10 class from the training fund.  (Plaintiff Reply on PFOF #114)   Gauchel's declaration should be disregarded, when it is directly contrary to his earlier deposition testimony. *Adusumilli*, 164 F. 3d at 360.  Undisputed facts therefore establish the plaintiffs never benefitted from training fund contributions made in their name, so that L & C cannot claim a credit for those contributions towards satisfying its obligation to pay the prevailing wage rates to the plaintiffs.

Unable to seriously argue to the Court that its personal and holiday pay contributions are bona fide unfunded plan contributions under §290.01(10)c, L & C instead makes the baseless argument that §290.01(10)c does not apply to its personal and holiday pay contributions.  L & C's argument should be rejected.  First, L & C cites to the note in §290.01(10) concerning what constitutes a bona fide benefit.   However, the note is placed in the introduction of an administrative code provision that applies to both funded and unfunded plans, and therefore equally applies to both types of plans that are addressed by the provision. The note defining what constitutes a bona fide benefit therefore does not establish whether the personal and holiday payments by L & C constitute funded or unfunded plans.

28

Next, L & C argues that its personal and holiday pay programs are governed by §290.01(10)b, rather than the provision for unfunded plans, §290.01(10)c.  L & C's argument should be rejected.  §290.01(10)a states verbatim that it applies to irrevocable contributions for bona fide economic benefits made by the employer to a trustee or to a third person.  §290.01(10)b tracks the language of §290.01(10)a, and clarifies that these same contribution for an economic benefit as described in 290.01(10)a, must be pursuant to a bona fide fund, plan, or program.  §290.01(10)b therefore merely clarifies, and only applies to programs covered by §290.01(10)a.

§290.01(10)b, just like §290.01(10)a, therefore only applies to programs where a contribution is made by employers to a third party administrator.  This interpretation is further supported by the note to §290.01(10)c, which explains that the purpose of §290.01(10)c is to:

> Permit the consideration of economic benefits that meet the requirements and are provided from the general assets of the employer.

§290.01(10)c therefore applies to programs where the benefits are paid directly by the employer, rather than paid by a third party administrator or similar person from pooled resources generated from employer contributions.  Since L & C pays the personal and holiday pay benefits out of its own assets, rather than by making contributions to a third party, whether the holiday and personal pay benefits are bona fide prevailing wage contributions are governed by §290.01(10)c.

L & C does not dispute that under §290.01(10)c, benefits are bona fide only when the employer makes an enforceable written commitment to provide the benefit, and a copy of the program describing the benefit is provided to the DWD.  Nor does L & C dispute that no copy of its holiday and personal pay program has ever been provided to the DWD.  (PFOF §108).  While L & C does claim in its response to the plaintiffs' PFOF that some of its personal pay benefits

are irrevocable, it does not dispute that all of the documents describing the personal pay benefits contain disclaimers stating that the benefits can be changed at anytime. (PFOF §103-104, 106) The handbook indeed provides that L & C may modify the handbook, including the fringe benefit provisions, at its discretion, and at any time, without prior notice, and in any manner deemed necessary or desirable.   (Plaintiff reply on PFOF #107)  Gauchel similarly admits that he could change the benefits at anytime.  (PFOF §107).   Additionally, the employee handbook contained a provision stating that employees would forfeit their accrued personal pay benefit, if they terminated their L & C employment without giving L & C two weeks notice.  (Id.)  Courts have held that similar disclaimers meant that the employer's promise of providing a benefit to the employee is illusory and unenforceable.  *Hegel v. Brunswick Corp.*, 2011 U.S. Dist. Lexis 30514 *14 (E.D. WI. 2011).  Here also L & C has never made a written enforceable commitment to provide personal and holiday pay to the plaintiffs.

Undisputed facts therefore establish that L & C cannot claim credit for its apprenticeship, personal, and holiday pay contributions in calculating the appropriate prevailing wage rate to pay to the plaintiffs.  L & C cannot rely on the DWD's finding of non-violation to persuade the Court to ignore its violations of Wisconsin prevailing wage laws.  There is no evidence what issues the DWD investigated, or that the issue of whether L & C made bona fide fringe benefit contributions came up at all during the DWD investigation.

> H.   <u>L & C CANNOT CHANGE ITS METHOD OF CALCULATING THE RATE OF FRINGE BENEFIT CONTRIBUTIONS AFTER THE FACT, TO AVOID ITS LIABILITY TO THE PLAINTIFFS.</u>

During the depositions, Gauchel testified both as a corporate representative and in his personal capacity that the rate for fringe benefit calculations is calculated based on 2080 hours worked per year minus the hours of paid leave received by the employee, rather than based upon

the actual number of hours worked by the employee during the year.  (Plaintiff reply on PFOF #109-110)  In the sole record citation by L & C, Gauchel testified that the fringe benefit rates calculated are listed on the employees' evaluations, thus supporting his earlier testimony that fringe benefit rates are calculated at a fixed rate assuming the employees would work 2080 hours minus paid leave hours, rather than based on the employees' actual hours worked for the current year.[11]

L & C does not attempt to argue that it can in this litigation disregard the actual method it used to calculate fringe benefit benefits, in favor of a different method that would decrease its prevailing wage liability.  Such an argument would be unsuccessful for three independently sufficient reasons.  First, permitting L & C to after the fact calculate the plaintiffs' prevailing wage contributions based on actual hours worked would mean that L & C could take a higher health insurance contribution credit on prevailing rather than non-prevailing wage projects.  This is impermissible since an employer may not avoid its obligation to pay prevailing wages by disproportionally paying fringe benefits out of the employees' prevailing wage income.  *Miree Construction Corp. v. Dole*, 930 F. 2d 1536, 1546 (11th Cir. 1991);  *Ind. Roofing Constr. v. Chao*, 300 Fed Appx. 518 (9th Cir. 2008) (Unpublished)[12].

Second, L & C's method of calculation is impossible to administer in real life.  L & C submits payroll certifications to the government, certifying the amount of wages paid to its employees and that the amount of wages paid complied with applicable prevailing wage

---

[11] See Plaintiff reply on PFOF #110, describing how L & C calculated Knudson's contribution rate for the time period between July 6, 2011 and July 6, 2012, using 2080 hours minus hours of paid leave, rather than his actual hours worked during the year.  L & C's claimed contribution for Knudson prior to July 6, 2011 was $1.80, rather than the $2.52 it is now claiming as a post hoc justification.  (Plaintiff reply on PFOF #110)

[12] L & C has not disputed that, assuming it can claim a credit for apprenticeship contributions, the credit must be calculated based upon the plaintiffs' total number of hours worked, rather than solely their apprenticeship hours worked.  This issue should be resolved against L & C as a matter of law.  (PFOF ¶118)

determinations, within two weeks of when the work was performed.  (Plaintiff reply on PFOF #113)  When the certified payroll is submitted the employee's work year has not ended, so that it is unknown how many hours the employee would work during the year, and it is impossible to calculate fringe benefit contributions based on actual hours worked by the employee during the year.  L & C should not be permitted to post hoc rely on a calculation method that would be impossible to administer to avoid its prevailing wage law obligations.

Third, on each of the payroll reports L & C certifies that the listed payments, including fringe benefits calculated based on 2080 hours worked minus paid leave, are accurate and complete.  (Id.)  L & C should not be permitted to now claim, in order to avoid prevailing wage liability, that the health insurance rates certified on the payroll certifications are in fact incorrect.

L & C does not dispute that for the time period before July 6, 2011, it did over-calculate the health insurance contribution for Knudson using the correct denominator of 2080 hours worked. [13]  Each of  L & C's procedural objections seeking to be excused from the calculation error should be rejected.  First, paragraphs 72 and 73 of the Second Amended Complaint explicitly alleged that L & C underpaid prevailing wages to the plaintiffs, by claiming higher and ficticious health insurance contributions.  (Docket #68)  Knudson's claim for L & C claiming an improper health insurance credit is therefore explicitly included in the complaint.

Second, no court has ever held, as L & C claims, that there is a de minimus exception under Wisconsin prevailing wage laws.  Even the FLSA de minimus exception is limited to instances where employees are not paid for seconds or minutes that as a practical matter cannot be accurately recorded.  *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 692 (1946); 29

---

[13] Knudson did not have any paid leave prior to July 6, 2011.  (Docket #169, Ex. 5)

C.F.R. §785.27; and therefore does not apply to instances where employees underpaid for hours that the employer admits the employees worked.

Third, L & C is incorrect in claiming that Knudson can only recover for underpaid prevailing wages on or after March 27, 2011.  A complaint amendment relates back to the date of the original complaint when the amendment concerns the same conduct, transaction, or occurrence.  Fed. Rule Civ. P. 15(c).  The rule applies to amendments to add plaintiffs, when the new plaintiffs were subject to the same type of violation as alleged in the original complaint. *Anderson v. Montgomery Ward*, 852 F. 2d 1008, 1018 (7th Cir. 1988); *Pawelczak v. Fin. Recovery Services*, 2012 U.S. Dist. Lexis 153914 (N.D. IL. 2012) (Relate back doctrine applies when new plaintiffs heard the same unlawful debt collection message in different telephone calls).  Similarly, Knudson's prevailing wage claims relate back to the original complaint, when they allege the same violations of Wisconsin prevailing wage laws, as alleged in the original complaint.  Knudson (just like Simmons) therefore can recover for prevailing wage violations that occurred on or after September 4, 2010.

Finally, the plaintiffs have demonstrated that L & C underpaid prevailing wages to the plaintiffs by claiming improper credit for fringe benefit contributions.  For example, for the week ending April 24, 2011 Knudson received a total package of $20.32, including $2.39 in fringe benefit contributions.  The $2.39 included $1.80 in health insurance, $0.14 in dental insurance, and $0.45 in apprenticeship contributions.  Since L  & C is only entitled to claim a $1.70 credit for health insurance, and cannot claim a credit at all for apprenticeship, it can only claim a total fringe benefit contribution of $1.84, so that it underpaid Knudson for $0.55 per hour. (Plaintiff reply on PFOF #115) The underpayments would become even more drastic, once L & C began

33

to take improper credit for personal and holidays that under clear DWD regulations, as argued above, do not constitute bona fide fringe benefit payments.

9.      Conclusion.

For the above stated reasons, the Court should find that L & C violated the FLSA and Wisconsin law in each of the ways listed in the plaintiffs' motion for summary judgment.

Dated this 3rd day of March, 2014.

s/Yingtao Ho
MARIANNE GOLDSTEIN ROBBINS
Wisconsin State Bar No. 1015168
YINGTAO HO
Wisconsin State Bar No. 1045418
The Previant Law Firm, S.C.
1555 N. RiverCenter Drive, #202
P.O. Box 12993
Milwaukee, WI   53212
Phone 414/271-4500
Fax 414/271-6308
mgr@previant.com
yh@previant.com
Attorneys for Plaintiffs

34