IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JEREMY WICKE, COLE KNUDSON,
and SHAWN SIMMONS,

                               Plaintiffs,                  OPINION & ORDER

    v.

                                                        12-cv-638-wmc

L&C INSULATION, INC.,

                             Defendant.

Among other claims, plaintiffs Jeremy Wicke, Cole Knudson and Shawn Simmons allege that their former employer defendant L & C Insulation, Inc. violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and Wisconsin employment laws by failing to pay them for time spent training and travelling and for failing to properly calculate their overtime rate.   On November 17, 2013, plaintiffs Cole Knudson and Shawn Simmons both accepted Rule 68 offers of judgment solely as to their claims under the FLSA.  (Dkt. ##140, 141.)  Defendant also submitted an offer of settlement to Wicke, which he rejected.  This offer is the subject of defendant's motion to dismiss for lack of jurisdiction.[1]  The court will deny that motion, finding the offer of settlement insufficient to satisfy the claims pending at the time the offer was made.

Also before the court is *plaintiffs'* motion for partial summary judgment, seeking liability on all of their asserted claims.   In light of Knudson's and Simmons' partial settlements, plaintiffs' motion for summary judgment solely covers: (1) Wicke's claims

---

[1] Earlier offers of judgment to Wicke were the subject of an earlier motion to dismiss, which the court denied, at least as to that basis.  (Dkt. ##29, 124.)

under the FLSA; and (2) all three plaintiffs' claims under state law.  For the reasons that follow, the court will deny plaintiffs' motion for partial summary judgment with respect to all claims save one, finding numerous factual disputes prevent entry of judgment in plaintiffs' favor at this time.  The court, however, will grant summary judgment to plaintiffs on their state law claim that defendant failed to calculate the overtime rate of pay as required by Wisconsin law.   The court will also grant summary judgment to defendant on two small claims concerning defendant's credits for prevailing wage jobs.

OPINION

## I.  Defendant's Motion to Dismiss

Defendant again moves to dismiss Wicke's only remaining federal claim -- his claim under the FLSA -- as mooted by an offer of judgment.  L & C also requests that the court then decline to exercise supplemental jurisdiction over the remaining state law claims.  As explained in the court's prior opinion and order on defendant's earlier motion to dismiss, "[o]nce the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate, and a plaintiff who refuses to acknowledge this loses outright, under Fed. R. Civ. P. 12(b)(1), because he has no remaining stake."  *Damasco v. Clearwire Corp.*, 662 F.3d 891, 894-95 (7th Cir. 2011) (internal citation and quotation marks omitted).

On January 8, 2013, defendant L & C tendered an offer of judgment in the amount of $18,000 plus costs, attorney's fees and expenses.  (Declaration of Stephen A. Watring, Ex. C (dkt. #144-3).)   Based on plaintiffs' expert report and discovery

responses, defendant maintains that the total monetary amount due to Wicke under the Second Amendment complaint is $16,513.91 exclusive of costs, attorney's fees and expenses, and therefore the $18,000 offer fully satisfied Wicke's claims.[2]

In response, Wicke essentially concedes that the $18,000 offer fully satisfied his individual claims. Instead, he argues that at the time L & C made the $18,000 offer, plaintiffs' motion for class certification was pending and, therefore, the offer did not provide full relief because it did not consider the interests of the unnamed class members. In *Griesz v. Household Bank (Illinois), N.A.*, 176 F.3d 1012, 1015 (7th Cir. 1999), the Seventh Circuit contrasted the situation presented in that case with a situation where "a bank had tried to buy off Griesz with a settlement offer greater than her claim before the judge decided whether to certify the class." The Seventh Circuit explained this latter "tactic is precluded by the fact that before the class is certified, which is to say at a time when there are many potential party plaintiffs to the suit, an offer to one is not an offer of the *entire* relief sought by the suit . . . unless the offer comes before class certification is sought." *Id.* (internal citations omitted). While this language arguably constitutes dicta, the same view was subsequently adopted by the Seventh Circuit. *Damasco*, 662 F.3d at

---

[2] Recently, plaintiff's counsel filed a declaration noting that plaintiffs' expert "update[d] the calculation of damages to prepare for trial," and based on newly-produced discovery, plaintiffs' expert now calculates Wicke's total damages at $19,744.53. (Declaration of Yingtao Ho (dkt. #206) ¶¶ 5-6.) Plaintiffs also served updated responses to defendant's discovery requests to reflect this updated calculation. (*Id.*, Ex. 1 (dkt. #206-1).) Not surprisingly, defendant moved to strike this declaration, positing several reasons. (Dkt. #208.) Since the declaration is not material to the motion to dismiss or motion for summary judgment, the court will deny as moot the motion to strike. To the extent defendant wishes to challenge plaintiffs' expert's updated calculations as untimely at trial, defendant needs only to advise the court and it will take up the motion as a motion in limine.

895 (explaining that "an offer to a named plaintiff does not moot a class action unless it 'comes before class certification is sought'" (quoting *Griesz*, 176 F.3d at 1015)).

In its reply brief, defendant nevertheless persists, pointing to cases where while *individual* claims may have been mooted by acceptance of a settlement, or for some other reason, there was a possibility, at least, that the class claims could still continue in some form.[3]  (*See* Def.'s Reply (dkt. #180) 2.)  These cases, however, are all distinguishable from the situation at hand because they either involved appeals of denials of class certification where the individual defendant had accepted an individual settlement *after* class certification had been denied, *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1043 (7th Cir. 2007); *Wrightsell v. Cook Cnty., Ill.*, 599 F.3d 781, 783 (7th Cir. 2010), or the possibility that a released prisoner could still serve as a class representative for purposes of securing injunctive relief, *Kifer v. Ellsworth*, 346 F.3d 1155 (7th Cir. 2003).

---

[3] Plaintiffs filed a motion for leave to file a sur-reply on the basis that "L & C should have known, at the time it filed its motion to dismiss, that the effect of the pending motion for class certification upon the sufficiency of its offer of judgment to Wicke would be a significant issue," and therefore should have briefed this issue in its opening brief.  (Pls.' Mot. to File Sur-Reply (dkt. #187) ¶ 6.)  Defendant opposed plaintiffs' motion for leave, and plaintiffs responded with a reply brief, resulting in defendant filing a motion to strike the reply brief because plaintiffs did not seek leave to file a reply. (Def.'s Mot. to Strike (dkt. #200).)  Plaintiff then filed a response to defendant's motion to strike the reply brief, resulting in a ridiculous snowball of paper.  The court will grant plaintiffs' motion for leave to file a sur-reply since defendant should have anticipated the core dispute here -- the motion for class certification's impact on defendant's motion to dismiss -- and briefed that issue in its opening brief.  The court also will grant defendant's motion to strike plaintiffs' reply brief in support of their motion to file a sur-reply in opposition to defendant's motion to dismiss.

4

Here, at the time Wicke rejected defendant's offer, the class claims were still pending. If he had accepted the offer of settlement, Wicke's adequacy as a class representative certainly would have been called into question. To disregard this key fact and allow defendant to pick-off named plaintiffs by buying out their individual claims would entirely undermine the solution crafted by the Seventh Circuit to address this problem:

> A simple solution to the buy-off problem that Damasco identifies is available, and it does not require us to forge a new rule that runs afoul of Article III: Class-action plaintiffs can move to certify the class at the same time that they file their complaint. The pendency of that motion protects a putative class from attempts to buy off the named plaintiffs.

*Damasco*, 662 F.3d at 896; *see also McCabe v. Crawford & Co.*, 272 F. Supp. 2d 736, 750 (N.D. Ill. 2003) (noting that offers of judgment are "inappropriate" when motions for class certification are pending) (citing *Greisz*).

In addition to the policy implications underlying the Seventh Circuit's concerns in picking off named plaintiffs, there may also be an intangible benefit to pursuing a class action which was not satisfied by defendant's $18,000 offer. *See Deposit Guaranty Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 338 (1980) ("The use of the class-action procedure for litigation of individual claims may offer substantial advantages for named plaintiffs; it may motivate them to bring cases that for economic reasons might not be brought otherwise."). Moreover, as a named plaintiff, Wicke may also be entitled to an incentive award or enhancement fee, which could push his total claim well above the $18,000 offered by defendant. *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 875 (7th Cir. 2012) (holding that "prospect of [an incentive] award gives [class

representatives] a tangible financial stake in getting the denial of class certification revoked and so entitles them to appeal that denial").

The court is also unpersuaded by defendant's argument that the denial of a class certification motion somehow resurrects an offer of judgment.  (*See* Def.'s Br. (dkt. #143) 7 n.3 ("Although the entire case cannot be dismissed as moot while a class certification motion is pending, once that motion is denied the question of mootness of Plaintiff's individual claim becomes appropriate for consideration.").)  This argument is contrary to case law stating that a Rule 68 offer must be evaluated based on the claims pending at the time the offer is made (or remains open).  *See Harbor Motor Co., Inc. v. Arnell Chevrolet-Geo, Inc.*, 265 F.3d 638, 648-49 (7th Cir. 2001) (rejecting defendant's argument that the offer of judgment exceeded the maximum recovery because at the time the offer was made, plaintiff still had a claim which provided a maximum statutory recovery far exceeding the offer of judgment).

For all of these reasons, the court will deny L & C's motion to dismiss Wicke's FLSA claim for lack of subject matter jurisdiction.  Based on this decision, the court will also reject L & C's motion for this court to decline to exercise jurisdiction over the remaining state law claims.

## II. Plaintiffs' Motion for Partial Summary Judgment

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In granting or denying summary judgment, the court must view all facts and draw all inferences in the nonmovant's favor.  *Anderson v.*

6

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, there must be enough evidence to allow "a rational trier of fact to find for the non-moving party."  *Id.* at 587.

Because the moving party has the burden of proof at trial, plaintiffs "must show that the evidence . . . is so one-sided that [they] must prevail as a matter of law."  *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) (quoting *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir. 1992)).  Contrary to plaintiffs' characterization, where the moving party has the burden of proof at trial, the moving party is not entitled to summary judgment if it has failed to produce evidence that would conclusively support its right to a judgment after trial, regardless of the nonmovant's response to lack thereof.  *See generally* 11 James Wm. Moore, *Moore's Federal Practice* § 56/40[1][d] (3d ed. 2014).

Plaintiffs seek summary judgment on the following claims: (1) failure to compensate plaintiffs for time spent in certain trainings and studying, including failure to pay overtime compensation for certain trainings; (2) failure to compensate plaintiffs for all travel time; (3) failure to calculate the overtime rate correctly; and (4) failure to calculate accurately benefits for prevailing wage jobs.

### A. Undisputed Facts[4]

#### 1. Parties

Plaintiffs are all former employees of L & C Insulation, Inc.  As reflected in its name, L & C is involved in the business of installing insulation.  Wicke was employed between November 2008 and March 2012; Simmons between November 2011 and March 2013; and Knudson between July 2010 and February 2013.

#### 2. Training

##### a. Expectations at time of hiring

Before each of the plaintiffs was initially hired by L & C, they were interviewed by its president, Peter Gauchel, and told about available training opportunities, including a four-year apprenticeship program.  Before their hiring, no one from L & C told them that they were *required* to be journeymen in order to work for L & C.  In particular, Gauchel never conveyed that completing insulator training is a prerequisite to working for L & C.

Plaintiffs contend that they learned how to work as insulators primarily by watching lead employees, asking questions, and practicing in the field.  Defendant does not dispute this, but contends that "[c]lassroom training involves a curriculum of everything students need to know to advance to journeymen and fulfills the hours of training for certified apprentices."  (Def.'s Resp. to Pls.' PFOFs (dkt. #175) ¶ 23.)  None of the plaintiffs, however, were ever apprentices recognized by the Apprenticeship Board

---

[4] Except as noted, the court finds the following facts material and undisputed.

of the Wisconsin Department of Workforce Development while they were employed by

L & C.[5]

### b.  Friday training classes

L & C also maintained a practice of expecting its trainee employees to attend "Friday training classes," which were held approximately once per month.   Plaintiffs maintain that these Friday training classes were designed to teach employees the properties of the different materials and how to install different types of insulation. Defendant does not dispute that characterization, but points out that the classes were designed to teach employees new and higher skills to allow them to advance to journeyman level work and pay, rather than just to teach them to do the job more efficiently.   On one occasion, plaintiffs loaded and unloaded trucks at the La Crosse warehouse for five to ten minutes during the time they were assigned to class.

The materials that were taught during the Friday classes attended by plaintiffs were organized into chapters.   At the end of each chapter, there was a closed book test that was given as either an in-class test or a take-home test.   Plaintiffs were not eligible for wage increases unless they received a passing grade of 70% or better on each test. The parties dispute whether there was time in class to complete a "take-home" test.   The parties also dispute whether employees could complete and pass a test simply by paying attention in class or whether employees would have to study on their own time and memorize the materials in the chapter.   Gauchel -- who taught the Friday training classes

---

[5] Presumably in further support of the purported limited value of the training, Simmons represents -- and defendant does not dispute -- that he did not attend his first Friday training class until he had already worked for three weeks in the field.

-- would not necessarily cover every question that would be on the test, but would cover enough questions so that the students could obtain a passing grade of 70%. Still, some of the chapters were complex. For example, a chapter on trade math included nine formulas, more than a dozen definitions, and instructions on how to perform other tasks such as bisecting angles and halving fractions.

If an employee failed to show up to the Friday training, they would receive a call from Gauchel about their non-attendance. L & C's employee handbook also provided in relevant part: "all employees are expected to attend scheduled company or department meetings. Special meetings are to be attended by those who are notified." (4/2/13 Deposition of Peter Gauchel ("4/2/13 Gauchel Depo."), Ex. 42 (dkt. #168-5).) Plaintiffs believed that the Friday training classes constituted "special meetings" and that attendance was required by the employee handbook. L & C concedes employees were not instructed that the Friday classes were other than special meetings at which attendance was ordinarily expected.

While L & C compensated plaintiffs for the time spent in training, L & C did not count the Friday training classes as hours worked in determining plaintiffs' eligibility for overtime pay. For example, for the week ending March 20, 2011, Jeremy Wicke worked 40 hours and attended a 1.5 hour Friday training class. Wicke was paid for 41.5 hours, but received no overtime pay for the week. Similarly, for the week ending November 11, 2012, Simmons worked 40 hours and attended two hours of Friday training classes, but received no overtime pay for the week. For the week ending October 14, 2012, Knudson

worked 38 hours, received credit for compensation purposes for two hours of drive time, and attended 1.25 hours of Friday training classes, but was again paid no overtime.

### c.  Nestle training

In addition to the Friday training classes, L & C also required employees to attend "Nestle training" -- training required for the purpose of qualifying employees to work for L & C at Nestle buildings -- on an annual basis.  As with Friday training, L & C did not pay employees at overtime rates for attending Nestle training even if they had already worked over 40 hours for the week.  Despite this, L & C's owner acknowledged at his deposition that "[i]f the Nestle training is overtime, it should be paid at overtime rates." (4/2/13 Gauchel Depo. (dkt. #168) 94:7-8.)

### d.  Unpaid trainings

Plaintiffs did not receive pay for four other trainings:  Fundamentals of Crew Leadership (Wicke and Knudson); OSHA 10 class (Simmons and Knudson); Firestop training (Wicke); and First Aid / CPR training (Wicke).[6]  The Fundamentals of Crew Leadership class consisted of four sessions of three hours each, and addressed how to organize materials better, how to accomplish work tasks more efficiently, and how to communicate more effectively with other members of the crew.  The parties dispute whether the training was designed to make employees more efficient and effective as L &

---

[6] Wicke attended the latter class at the Wausau Red Cross, which addressed how to perform CPR and provide medical care.  The Firestop class was taught by a representative from the company that manufactured the firestop materials and concerned how to install these materials.  Wicke needed the training in order to be certified to apply the materials involved.  Plaintiffs contend that these were the same materials Wicke was using during the course of his work for L & C, whereas defendant explains that Wicke was learning a new skill.

C employees (plaintiffs' position) or whether the training addressed leadership skills more generally (defendant's position).

Employees were also required to complete OSHA training.  Although the parties dispute whether that training had to occur before they were permitted to work as insulators, L & C viewed OSHA training as part of its safety policy.  The parties also dispute the purpose of OSHA training:  plaintiffs argue that the purpose was to make employees safer for L & C's benefit, both by developing better insulators and by saving money on L & C's workers' compensation premiums; defendants contend that the training helps L & C employees more generally, both to advance to journeyman status and to be better insulators for themselves and for their families.

### e.  Training expectations

Employees were informed that they were scheduled to attend trainings either through (1) direct notice from an L & C supervisor or (2) a note received along with their paychecks.  Either way, the notice informed the employee of the location and time of the training.[7]  L & C employees receive notice of training, even if they expressed no interest in attending.  Moreover, L & C never informed plaintiffs that they had the option of skipping training courses.  On the contrary, if an employee missed a scheduled training, Gauchel called the employee to inquire why he did not attend.

If an employee failed to attend at least one type of training -- an OSHA 30 class -- he was required to reimburse L & C for the $145 enrollment fee.  None of the plaintiffs,

---

[7] These notices were the same as those provided to employees to advise of the company's yearly meetings, for which employees receive compensation as "special meetings" as described in the employee handbook.

however, remained employed at L & C long enough to be enrolled in or attend the OSHA 30 course.

Each annual review that L & C issued to plaintiffs listed "training class" or "apprenticeship class" -- covering the Friday classes and other training class described above -- as an area for plaintiffs to work on during the following year. Areas to work on constituted a blueprint for an employee to develop skills in the trade and receive the next raise. Employees received their annual review at the same time they received their wage rate for the next year on non-prevailing wage projects. Each plaintiff understood that their attendance at unpaid trainings would be considered by L & C as part of their annual wage reviews.

### 3.  Travel Time

While employed with L & C, Wicke resided in Wausau, Wisconsin, and Simmons and Knudson resided in Eau Claire, Wisconsin. Plaintiffs were regularly required by L & C to work at worksites away from their homes of Wausau and Eau Claire, Wisconsin, respectively. These jobsites could be an hour and a half or more driving time from plaintiffs' homes.

If plaintiffs' drive time between their home and the jobsite was more than two hours each way, L & C normally only compensated plaintiffs for the drive time that exceeded two hours each way, regardless of whether the driving occurred during normal working hours. Because of this policy, plaintiffs did not record on their timesheets or claim compensation for the first two hours of travel time to a jobsite. For example, during a week in November 2012, Simmons was paid at least 10 hours per day for work

13

completed Monday, Tuesday and Wednesday on a project in Reeseville, Wisconsin. On Thursday, Simmons worked six hours and then spent four hours driving home to Eau Claire.[8]  Simmons only claimed and was paid for two hours of driving. Plaintiffs were normally paid at the minimum wage rate for excess driving time.

Plaintiffs received this "drive pay" for the portion of their trip in excess of two hours each way even if they drove home the same night, and did not have a motel stay away from home. In contrast, plaintiffs were eligible for company-paid hotel stay and a per diem meal reimbursement when they worked at a jobsite 90 miles or more from their homes. Defendant area supervisors used their discretion in determining whether a hotel room is appropriate in light of whether the insulator will be working on the same project the next day, where the next project is located, how many hours worked, and weather conditions, among other factors.

Simmons and Knudson regularly worked far enough away from their homes to stay at a company-paid hotel. Wicke stayed overnight at hotels when he worked at jobsites outside of Wisconsin. L & C did not maintain any records of when its employees began and finished working for the day.

### 4. Overtime Calculation

L & C maintained a policy of always paying plaintiffs overtime pay calculated at the rate for the actual work they performed during overtime hours. For example, if after

---

[8] According to Google Maps, Reeseville, Wisconsin is located 185 miles from Eau Claire, Wisconsin, and without traffic, it takes 2 hours and 54 minutes to drive from Reeseville to Eau Claire.  *See* https://www.google.com/maps/dir/Reeseville,+WI/Eau+Claire,+WI.

working 40 hours, plaintiffs were compensated for drive time, they were paid at an overtime rate of $10.88 (representing the overtime minimum wage), even though at times during the week they were performing work at a rate higher than minimum wage.

### 5.  Treatment of Fringe Benefits on Prevailing Wage Jobs

For prevailing wage projects, L & C claimed a credit for the personal and holiday pay benefits that it paid.  L & C paid personal and holiday benefits itself and did not make contributions to a third-party administrator or trustee for the purpose of paying these benefits.  L & C did make contributions to third-party administrators for the health and apprenticeship credits that it claimed on prevailing wage projects.

L & C provides it employees with two documents describing personal and holiday pay benefits:  the employee handbook and employees' annual wage reviews.  While both documents state expressly that they are not contracts, the parties dispute whether the handbook constitutes a written guarantee of the holiday and personal pay benefits for L & C employees pursuant to Wis. Stat. § 109.01(3).

If they quit L & C without giving two week's written notice, the handbook also contained a provision stating that employees would forfeit payment for personal time earned but not taken.  Plaintiffs contend that this policy is consistent with L & C's right to modify the fringe benefits at any time.  Defendant does not dispute that it had a right to modify benefits *prospectively*, but contends that payment of earned personal time is legally guaranteed under Wis. Stat. § 109.01(3).

At his deposition, Gauchel testified that he was not aware of L & C ever providing a description of its personal or holiday leave benefits to the Wisconsin Department of

Workforce Development.   (1/5/14 Gauchel Dep. (dkt. #169) 108.)   While defendant nevertheless contends that L & C provided this information during a prevailing wage audit, the evidence submitted in support -- ¶ 14 of Gauchel's declaration -- only states that L & C was subjected to a DWD audit in 2011 and 2012, without any reference to L & C providing this specific documentation to DWD.  (Gauchel Decl. (dkt. #177) ¶ 14.)

L & C claimed a $0.45 per hour credit for its contributions to a training trust established with the ABC Apprenticeship Committee.   During plaintiffs' employment, however, the trust fund only provided reimbursement for annual apprenticeship fees, ABC skill competitions, the OSHA 30 class, and the OSHA 10 class.  Plaintiffs were not apprentices and did not take part in the competitions, and the trust fund did not provide reimbursement for the OSHA 10 class plaintiffs attended.   Defendant contends that plaintiffs benefited from the contribution all the same, because they received the same class training as apprentices and received credit toward an apprenticeship.[9]

**B.  Claims**

**1.  Training and Study Time**

Plaintiffs claim that defendant violated the FLSA and Wisconsin employment laws by failing to (1) compensate them for certain trainings; (2) compensate them for time spent studying and taking tests outside of working hours; and (3) include training time in overtime calculations.

**a.  Compensable trainings**

---

[9] The court will take up the parties' dispute about L & C's credit for Knudson's health insurance benefits in the opinion below.

Under FLSA-implementing regulations, trainings are considered compensable work unless all four of the following criteria are met:

>   (1) attendance at the trainings is outside of the employee's regular working hours;
>
>   (2) attendance is in fact voluntary;
>
>   (3) the course is not directly related to the employee's job; and
>
>   (4) the employee performs no productive work during the course.

29 C.F.R. § 785.27. Wisconsin has adopted the same regulation. *See* Wis. Admin. Code § DWD 272.12(2)(f)(1). Plaintiffs contend that the four unpaid trainings identified above in the fact section -- Fundamentals of Crew Leadership class; Firestop class; OSHA training; and First Aid / CPR training -- and the time spent studying and completing take-home tests for the Friday trainings are compensable because they were (i) mandatory and/or (ii) directly related to the employee's job.

### i.   Mandatory time

Plaintiffs' argument that the trainings and study time was mandatory is evaluated from the employee's reasonable perspective. "Attendance is not voluntary, of course, if it is required by the employer. It is not voluntary in fact if the employee is given to understand or led to believe that his present working conditions or the continuance of his employment would be adversely affected by nonattendance." 29 CFR § 785.28; *see also* Wis. Admin. Code § DWD 272.12(2)(g)(2).

In support of their argument that the training was mandatory, plaintiffs point to the fact that: (1) they received notices of trainings, irrespective of any expression of

interest in the training; (2) they were *not* told the trainings were optional; (3) L & C's president would call employees who missed the training; (4) plaintiffs assumed the training fell within "special meetings" in the handbook, which would make them mandatory; and (5) their attendance was tied to wage increases.  Defendant primarily responds that:  (1) plaintiffs were never told that they were mandatory; and (2) plaintiffs' failure to attend trainings or pass tests did not adversely affect the continuation of their employment, just their rate of pay.   While plaintiffs would seem to have the better of the evidence, the court cannot find *as a matter of law* that the trainings were mandatory, particularly since much of the evidence may depend on credibility determinations of plaintiffs and Gauchel.   Rather, a jury is required to weigh the evidence and draw inferences in order to find plaintiffs have met their burden of proof that their attendance was required by the employer.

As for the study and test-taking time, there is a fundamental dispute of fact as to whether the study time or take-home test time was even necessary; and if so, whether any studying or test-taking could have occurred during the Friday training classes themselves. Putting aside what time, if any, was required, the parties dispute whether plaintiffs needed to expend any time outside of the Friday training classes in order to secure eligibility for pay increases or avoid any adverse effect on plaintiffs' working conditions. All of this signals that plaintiffs may not meet their burden of demonstrating that study time was mandatory at trial, much less that they are entitled to summary judgment on this issue.

18

### ii.    Job-related time

Plaintiffs also argue that the trainings at issue were directly related to their work, because they were learning how to install insulation and to be better employees, generally.   Defendant responds that if the "training is to provide the employee new knowledge, to teach new skills, or to prepare the employee for advancement or promotion, it is not 'directly related' for purposes of this test."   (Def.'s Opp'n (dkt. #174) 9 (citing *Dade County v. Alvarez*, 124 F.3d 1380 (11th Cir. 1997)).)[10]   Once again, this dispute turns on a factual dispute.   Specifically, a jury must decide whether the various trainings and time spent studying or completing take home tests were "directly related" to plaintiffs' ability to do their jobs at L & C or more broadly related to becoming journeymen or fulfilling some other, larger purpose.

### b.  Pre-employment training

Separate from the test defined above, defendant argues that "employers need not compensate applicants for training that the employer requires before the applicant commences work."   (Def.'s Opp'n (dkt. #174) 4 (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947)).)   In *Walling*, the United States Supreme Court held that a two-week training course for prospective yard brakeman need not be compensated at the minimum wage because those trainees were not yet employees under the FLSA.   The

---

[10] As far as the court can tell, *Alvarez* does not strictly exclude from compensation "directly related" training because it provides new knowledge or teaches new skills. Rather, the *Alvarez* court held that off-duty time spent maintaining physical fitness standards mandated by the plaintiffs' jobs as police officers was not compensable under the FLSA.   *Id.* at 1385.   Regardless, the training and study time at issue here is sufficiently distinct from physical fitness training to render the court's reasoning in *Alvarez* of limited guidance.

First Circuit has extended this principle further to training completed after hiring, if it could have been completed before hiring. *Id.* (citing *Bienkowski v. Ne. Univ.*, 285 F.3d 138 (1st Cir. 2002)).  Here, there are disputes of fact as to plaintiffs' employment status during the time of at least some of their trainings.[11]  In addition, defendants have not pointed to any cases where the unpaid training occurred over an extended period of time after hiring, as would seem to apply to much of the training at issue here.

### c.  Overtime

Plaintiffs also challenge defendants' failure to include time spent in the Friday training classes and Nestle training in calculating overtime.  As previously discussed, both federal and state law requires compensation of not less than one and a half times the regular rate for any hours worked in excess of 40 hours per week.  29 U.S.C. § 207(a)(1); Wis. Admin. Code § DWD 274.03 (requiring overtime for over 40 hours per week).[12]

In response, defendant argues that plaintiffs did not plead a claim for overtime since all of plaintiffs' training-related claims concern (1) *unpaid* training or (2) Friday and Nestle trainings for which plaintiffs *were* compensated.   To the extent the court understands this challenge, it borders on the silly.  Plaintiffs' claim that they were not

---

[11] For example, OSHA 10 training may fall within this category, but the parties dispute whether the training had to occur before plaintiffs started working at an L & C jobsite. Moreover, to the extent this training was "imposed not by the employer, but by a governmental agency which requires the training for any employment in that line of work," that may be enough to deem the training "voluntary" under the FLSA. *Haszard v. Am. Med. Response Nw., Inc.*, 237 F. Supp. 2d 1151, 1153 (D. Ore. 2001) (citing Wage and Hour Letter Opinion, WHM 99:8195, 8195-96 (Nov. 19, 1998)).

[12] If defendant is found liable for failing to compensate plaintiffs for time spent in the four trainings described above or for studying, then those hours should also be included in any overtime calculations.  29 U.S.C. § 207(a)(1) and Wis. Stat. § 109.03(5).

paid for training is sufficient to include the claim that they were not paid in full for overtime.[13]

Defendant also argues that plaintiffs have not established that they attended the Nestle training at all, and therefore plaintiffs were not impacted by L & C's decision not to include hours spent at that training in overtime calculations, but this too is a factual dispute preventing summary judgment.

## 2.  Travel

Plaintiffs acknowledge, as they must, the general presumption that home and work commute time is not compensable.  *See* 29 U.S.C. § 254(b)(1).  Still, they claim that L & C violated the FLSA in failing to compensate Wicke for travel time "away from home" as provided under 29 C.F.R. § 785.39.  The statute defines "travel away from home" as "[t]ravel that keeps an employee away from home overnight."  29 C.F.R. § 785.39.  With that definition in mind, the regulation provides that "travel time is compensable when it cuts across: 1) an employee's workday and 2) an employee's regular working hours on nonworking days." *Bassett v. Tenn. Valley Auth.*, No. 5:09-CV-00039, 2013 WL 2902821, at *8 (W.D. Ky. June 13, 2013).  "Travel time is not compensable when: 1) it occurs outside of the employee's regular working hours, whether on working or nonworking days, or 2) the employee is a passenger on a common carrier and his travel occurs during his regular working hours on nonworking days." *Id.*

---

[13] The court has already addressed defendant's alternate argument that it was not required to pay plaintiffs for the Friday and Nestle trainings, and therefore not required to include this time in overtime calculations, because the trainings were not mandatory or directly-related to their jobs.

It is undisputed that L & C only compensated Wicke for travel time that exceeded two hours, and then only for the portion of time in excess of two hours.[14]  Moreover, L & C provided this limited compensation regardless of when the driving took place, i.e., whether or not it took place during regular working hours.  Despite these undisputed facts, plaintiffs have yet to establish what constitutes "normal working hours," and whether Wicke's travel from his home to jobs which required an overnight stay took place during regular working hours.  Accordingly, the court must deny plaintiffs' motion for summary judgment with regard to travel time under Wicke's FLSA claim.

Plaintiffs also allege that defendant violated Wisconsin state law by failing to pay for travel time as required by Wis. Admin. Code § DWD 272.12(2)(g)(6), which provides:  "Travel time away from the home community for business purposes that occurs for the benefit of the employer is considered hours worked."  Subsection (2)(g)(6) is part of a larger regulatory scheme, defining different types of travel, only some of which are compensable.  For example, subsection (2) of the same regulation provides that "[n]ormal travel from home to work is not work time."  Wis. Admin. Code § DWD 272.12(2)(g)(2).  Under subsection (4), home to work travel on special, one-day assignments in another city are nevertheless compensable, except for a deduction for any normal home-to-work travel (e.g., the time spent travelling from home to the railroad site).  Wis. Admin. Code § DWD 272.012(2)(g)(4).  Lastly, subsection (5) governs "travel that is all in the day's work," and provides that travel from one job site to another

---

[14] In light of L & C's undisputed practice with respect to compensating employees for travel time, plaintiffs' argument that defendant has an obligation to pay for all travel time because of a "custom or practice" under 29 U.S.C. § 254(b)(2) is without merit.

job site during the workday is compensable.   Wis. Admin. Code § DWD 272.012(2)(g)(5).

Unfortunately, there appears to be no case law interpreting these various provisions of § DWD 272.012.   Defendant contends that given the structure of subsection (2)(g) and its juxtaposition with the federal regulations governing travel time, a fair reading would be that subsection (g)(2), (3) and (4), all concerning "home to work" travel involve "commuting," whereas subsections (5) and (6) involve "non-commuting" travel.   Defendant, however, does not define what would constitute "commuting" or otherwise explain why this distinction is material with respect to plaintiffs' claims. Regardless of these remaining legal uncertainties, plaintiffs have also yet to prove that their travel occurred outside of their home communities, or indeed what constitutes their respective "home community."   While some or all of these legal and factual issues may still be resolved short of trial, the record on summary judgment does not allow the court to do so.

### 3.  Overtime Rate Calculation

Under L & C's policy, overtime pay is calculated using the rate for the specific work that the employee performed during overtime hours (e.g., the hours over 40 hours per week).  Under Wisconsin law, the overtime rate should be calculated using the *average* wage rate earned during the workweek.  The Department of Workforce Development issues a Wisconsin Hours of Work and Overtime Pay pamphlet which provides:

> An employee may choose to pay employees on a salary, commission, piece rate or other basis, but for purposes of calculating overtime pay for an employee, the employee's

> wages must be converted into an hourly rate of pay.  This can
> be accomplished by dividing the total hours an employee
> usually works in a pay period into the total regular wages the
> employee is paid in that pay period[.]

(Declaration of Yingtao Ho ("Ho Decl."), Ex. 7 (dkt. #160).)[15]  *See also Kuhnert v.*

*Advanced Laser Machining, Inc.*, 2011 WI App 23, ¶ 14, 331 Wis. 2d 625, 794 N.W.2d

805 (upholding DWD's "methodology because it is not contrary to the clear meaning of

the applicable statutes and regulations").

In response, defendant attempts to distinguish *Kuhnert* and to cast doubt on the

weight the court should give to the pamphlet's informal instruction that an hourly rate of

pay calculation "can be accomplished" by dividing the total hours by the total regular

wages.  Regardless of any differences between the situation in *Kuhnert* and that presented

here, the Wisconsin Court of Appeals adopted the methodology as described in the

pamphlet quoted above.  Moreover, if there may be other acceptable methods for

calculating an hourly rate of pay, defendant has neither proposed nor explained how its

policy of paying only the rate for the specific work that the employee performed during

overtime hours satisfies the requirement that an employer calculate an hourly rate for

---

[15] After plaintiffs' motion for summary judgment was fully briefed, defendant filed a motion for leave to submit supplemental legal authority, explaining that it had just discovered through its own research a DWD position statement on calculating overtime rates.  (Dkt. #191.)  Defendant does not explain the relevance of this position statement and expressly states that it is not seeking to supplement or amend its brief in opposition.  (Def.'s Br. (dkt. #192) 2.)  As such, the impact of this submission on defendant's opposition to plaintiffs' motion for summary judgment, if any, is far from clear.  A cursory review of the procedure described in the DWD document supports some averaging of wages in determining a rate for overtime purposes.  Without more from defendant, this submission is simply not helpful to the court.  Therefore, the court will deny defendant's motion for leave to file it without prejudice to this document being submitted at trial.

purposes of paying overtime.  As such, plaintiff has met its burden of demonstrating as a matter of law that L & C violated Wisconsin law in calculating the rate of overtime pay in those instances where plaintiffs were compensated at a lower rate for mandatory job-related training exceeding 40 hours.

### 4.  Credits for Prevailing Wage Jobs

Wisconsin statutes provide a method for determining the prevailing wage for all projects for a local governmental unit.  Wis. Stat. § 66.0903.  To discharge its duty under this statute, the employer pays the prevailing wage rate in cash *or* may pay cash and "incur[] costs for bona fide economic benefits if the total of the cash payment and the total hourly contribution for the bona fide economic benefits equal or exceed the total prevailing wage rate."  Wis. Admin. Code § DWD 290.04(1).  Based on this statutory and regulatory framework, plaintiffs reason that L & C owes "wages to its employees for prevailing wage projects if it claims credit for fringe benefits that are not bona fide." (Pls.' Br. (dkt. #152) 27.)  Specifically, plaintiffs claim that defendant L & C violated this regulatory scheme in (1) taking credit for holiday and vacation time which are not bona fide fringe benefits, (2) taking credit for an apprenticeship program for which plaintiffs did not benefit, and (3) erring in calculating Knudson's health credit.

As an initial matter, defendant argues that plaintiffs' right to recovery is limited to "their unpaid wages and proportional liquidated damages."  (Def.'s Opp'n (dkt. #174) 27.)  As far as the court understands plaintiffs' claim, that is all they are seeking.  Under Wisconsin law, an employer must pay the prevailing wage rate on prevailing wage projects.  Wis. Admin. Code § DWD 290.04(1).  The prevailing wage rate can either be

paid (1) all in wages or (2) in wages and a credit for certain benefits.  If an employer takes a credit for which it is not entitled, then an employer is liable to the employee for (1) the wages he or she would have received absent that impermissible credit, and (2) an additional amount as liquidated damages.  Wis. Stat. § 66.0903(11)(a)(1).  With that in mind, the court will address plaintiffs' specific claims.

*First*, plaintiffs contend that defendant erred in taking a credit for holidays and personal days.  In support of this argument, plaintiffs contends that this credit constitutes an "unfunded program" under § DWD 290.01(10), and therefore defendant was required either to (1) make a written commitment to carry out a financially responsible plan or program; or (2) provide a copy of the unfunded plan to the DWD. (Pls.' Br. (dkt. #152) 27.)   The court, however, rejects plaintiffs' attempt to force holidays and personal days into the "unfunded program" framework.  As set forth in Note (b) of § DWD 290.01(1), holidays and personal days are not an "unfunded program," but rather are "a usual fund, plan or program" or a "conventional economic benefit[]" for which "[e]mployers may take credit for contributions . . . without requesting the approval of the department."   As such, it is immaterial whether the handbook or annual wage reviews provided a written commitment to these days or whether L & C ever provided written documentation of its holidays and personal days plan.

*Second*, plaintiffs challenge L & C's hourly credit of $0.45 for a training trust set up with the ABC Apprenticeship Program on the basis that plaintiffs were not apprentices during their tenure at L & C, and therefore received no benefits from those

contributions.  However, a fact issue remains as to whether plaintiffs still benefited from the trust fund in light of their receipt of certain training as part of the relationship between L & C and ABC Apprenticeship Program regardless of the fact that they were not apprentices.

*Third*, plaintiffs argue that L & C erred in taking a $1.80 hourly health insurance benefits credit on prevailing wage projects worked by Knudson during the period from January 1, 2011, through April 30, 2011.  Plaintiffs contend that defendant should have only claimed $1.70 per hour, whereas defendant contends that a credit of $2.52 would have been appropriate.  This dispute turns on a legal issue:  whether L & C should have calculated the credit based on the *actual* hours worked (defendant's approach) or the *maximum possible* hours Knudson could have worked (plaintiffs' approach).

In support for their argument, plaintiffs rely solely on L & C's own policy in calculating the benefit, arguing that L & C erred in calculating Knudson's health insurance credit for this period of time.   In a 30(b)(6) L & C deposition, Gauchel described L & C's calculation for the health insurance benefit credit.  Importantly, in walking through the math, Gauchel assumed that a person actually works 1,920 hours per year, by deducting 160 hours (accounting for six holidays and 14 personal days) from a total possible 2,080 hours (52 weeks a year, 40 hours a week).  (4/2/13 Gauchel Dep. (dkt. #168) 27-29.)   Plaintiffs ignore the deduction for 160 hours for holidays and personal days, and assume that L & C's calculation is based on 2,080 hours per year. Using that number, plaintiffs contend that the correct credit should be $1.70 per hour (monthly cost of insurance of $294.12 multiplied by 12 months and then divided by

2,080), while defendant relied on the actual number of hours worked and used that amount to calculate an hourly credit of $2.52.

If one takes the 1,920 hours Gauchel used in his deposition testimony -- plaintiffs' sole support for finding an error --, the credit works out to be roughly $1.84 per hour ($294.12 multiplied by 12 months and then divided by 1,920).  Absent some other basis for finding L & C in violation of its own policy, and in turn -- under plaintiffs' theory -- in violation of state law, plaintiffs' claim with respect to Knudson's health insurance credit also fails as a matter of law.

ORDER

IT IS ORDERED that:

1) defendant L & C Insulation, Inc.'s motion to dismiss for lack of jurisdiction (dkt. #142) is DENIED;

2) plaintiffs Shawn Simmons, Cole Knudson and Jeremy Wicke's motion for summary judgment (dkt. #147) is GRANTED with respect to plaintiffs' claim that defendant violated Wisconsin law in calculating the overtime rate of pay and DENIED in all other respects;

3) summary judgment is entered in favor of defendant on plaintiffs' claim that defendant violated Wisconsin state law by taking an improper credit for holidays and personal days and for plaintiff Knudson's health insurance benefits;

4) plaintiffs' motion for leave to file sur-reply brief (dkt. #187) is GRANTED;

5) defendant's motion for leave to file supplemental legal authority (dkt. #191) is DENIED;

6) defendant's motion to strike plaintiff's reply brief (dkt. #200) is GRANTED;

7) defendant's motion to strike declaration of Yingtao Ho (dkt. #207) is DENIED; and

8) the court will hold a telephonic status conference on July 10, 2014, at 9:00 a.m. to address how best to streamline the factual issues that remain for trial before a jury; plaintiffs shall initiate the call.

Entered this 1st day of July, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge